A02A1081. DAVIDSON v. THE STATE.
(570 SE2d 698)

MILLER, Judge.

Dominic Davidson appeals his conviction of possession of cocaine, contending that his motion to suppress the cocaine should have been granted because (1) the stop of his car was made without a reasonable articulable suspicion of criminal activity, (2) the discovery of the cocaine was the result of his illegal roadside detention, and (3) the chain of custody of the cocaine was not established. Discerning no error, we affirm.

The standard for reviewing a trial court's decision on a motion to suppress is clear:

> In reviewing a trial court's decision on a motion to suppress, an appellate court's responsibility is to ensure that there was a substantial basis for the decision. Our Supreme Court has established three guiding principles for reviewing such rulings: First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support them. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing

court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.

(Citation, punctuation and emphasis omitted.) *State v. Braunecker*, 255 Ga. App. 685-686 (566 SE2d 409) (2002). Moreover, "in reviewing the denial of a motion to suppress, this Court may consider both the transcript of the motion hearing and the trial transcript." (Citation omitted.) *Barnes v. State*, 228 Ga. App. 44 (491 SE2d 116) (1997); accord *Goddard v. State*, 244 Ga. App. 730, 731 (1) (536 SE2d 160) (2000).

Construed in the light most favorable to the court's ruling, the evidence showed that the arresting officer was traveling in a marked patrol car on a two-lane portion of an interstate just past an exit when he noticed Davidson, about two car lengths ahead of him and in the lane to his right, slow down, roll his window down, and "flag[ ] at me, waving his hand and turning back in his seat in my direction . . . trying to get my attention." The officer pointed for Davidson to pull over, and he did so. Without activating blue lights, the officer pulled over to the other shoulder. Davidson then ran across the interstate in medium to heavy traffic to the officer, who asked him to go back to his car carefully so the officer could move his unit over to the other shoulder behind Davidson. Once behind Davidson's car, the officer activated his blue lights for safety and exited his unit to determine what was going on.

Davidson indicated he had to use the bathroom and wanted to know where the nearest restroom was. He was extremely excited, stood very close to the officer, talked very fast, and was jumpy and nervous; also, his concentration was short, he was looking around, and his hands were moving a lot. He asked whether the officer would arrest him if he went off to the tree line, presumably to urinate, and the officer said he would not. Less than a mile earlier, Davidson had passed an exit with signs indicating that there were gas stations. The officer felt he needed to "look a little further" because "whenever somebody . . . overdoes something, there is usually a reason."

The officer thought the reason Davidson was so jumpy might have been his physical distress, but when Davidson returned, his demeanor was still the same, and the officer asked to see his driver's license. Davidson hesitated and said he needed to get to Charlotte as soon as possible, but he cooperated. When he pulled his license out of his wallet, the officer saw a second one, which he asked to see. The second license turned out to be torn up and expired. While checking the first license, the officer noticed that Davidson was in an extreme hurry to leave.

The officer also asked for an insurance card, and Davidson got back in the driver's seat, looked around very quickly (though not in

the glove compartment), and said he did not know where it was; he then put the key into the ignition and looked up into the mirror. Something felt wrong to the officer, who feared Davidson might be about to drive off, so he had Davidson step to the back of his car so the officer could ask him a few more questions. The officer asked him if he had any weapons, large amounts of currency, or drugs. Davidson replied that he did not; but his nervousness and excessive politeness made the officer suspicious, and he asked Davidson who owned the car. Davidson responded that a friend owned it.

The officer then asked Davidson whether he could search the car, and he took Davidson's evasive response as a refusal. He then got his drug-sniffing dog out of his unit and, without objection from Davidson, walked the dog around Davidson's car. This occurred less than five minutes after Davidson's return from the tree line. The dog alerted on the front passenger door. By then backup had arrived, and the original officer took the keys from the ignition, unlocked the glove compartment, and found a manila envelope inside. Upon opening the envelope, the officer found two bags of a substance he suspected was cocaine and arrested Davidson. A further search of the car revealed $207 in currency.

1. (a) Davidson first claims error in the denial of his motion to suppress because, he says, the stop of his car was made without a reasonable articulable suspicion of criminal activity. In *Childress v. State*, 251 Ga. App. 873, 874 (1) (554 SE2d 818) (2001), the officer noticed a car that appeared to have run off the road. He did not see anyone near it and had not seen anyone walking before coming to it. Id. Accordingly, he continued in the direction he had been heading to see if the driver needed assistance. Id. After about two miles he came across the defendant and approached him without engaging his siren or emergency equipment. Id. at 874-875 (1). As the defendant stood up, the officer noticed that he was unsteady on his feet. Id. at 875 (1). The officer further observed that the defendant's speech was slurred, his eyes were red and glassy, and he smelled strongly of alcohol. Id. The defendant admitted that he had been driving the car the officer had seen and that he had run off the road. Id.

We held that this evidence showed that the officer's initial approach to the defendant was "solely to determine if he were a motorist in need of assistance" and that it therefore was a first-tier police-citizen encounter, which "provides no Fourth Amendment protection" — i.e., does not require a particularized and objective basis for suspecting criminal activity, as does a second-tier encounter. *Childress*, supra at 875-876 (1). Similarly, here it appeared that Davidson was signaling to the officer that he was in need of some kind of assistance, and thus, as in *Childress*, the officer's initial approach to Davidson was "solely to determine if he were a motorist

in need of assistance." Id. at 876 (1). Accordingly, we find no merit to this claim of error.

(b) Davidson next contends that the trial court erred in denying his motion to suppress the cocaine evidence, arguing that it was obtained as a result of his illegal detention. We disagree.

As an initial matter, asking to see Davidson's license and proof of insurance upon his return from the tree line was permissible because an officer may ask to see such documentation during a first-tier police-citizen encounter. *Davis v. State*, 237 Ga. App. 890, 891 (517 SE2d 115) (1999). "Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search — as long as the police do not convey a message that compliance with their requests is required." (Citation omitted.) *Stokes v. State*, 238 Ga. App. 230, 232 (518 SE2d 447) (1999). The evidence does not reveal that the officer forced or coerced Davidson into complying with his initial requests. To the contrary, the questions asked and requests made were all part of a conversation that was consistent with a first-tier police-citizen encounter. See id. at 233.

The incident did, however, move from a first-tier to a second-tier encounter (requiring reasonable suspicion of criminal activity) after the officer removed Davidson's keys from the ignition, indicating that Davidson was no longer free to leave. Cf. *Kelly v. State*, 129 Ga. App. 131, 133 (2) (198 SE2d 910) (1973) (defendant was not free to leave where officers approached a stopped vehicle brandishing a pistol and badge and asked for the keys). Even so, we find this court's decision in *Warren v. State*, 254 Ga. App. 52, 55 (2) (561 SE2d 190) (2002), to be controlling and hold that the officer's actions were permissible in this case.

In *Warren* a police officer asked to see a driver's vehicle registration as a matter of routine. Id. at 52. The driver said that it was in a folder in the backseat, which seemed unusual to the officer, since, in his experience, most people keep their registration in the glove box. Id. at 52-53. When the officer approached the car and asked the passenger to hand him the vehicle registration, he noted that the passenger was extremely nervous and that he would not look at the officer or acknowledge him in any way, and when he opened the folder he began dropping papers on the floor and picking them up again. Id. at 53. The officer testified that the passenger was unusually nervous for a passenger; he described him as "freaked out." (Punctuation omitted.) Id.

The officer asked the driver if he could search the vehicle, and the driver responded that the officer could do a plain view search, but he could not open anything. *Warren*, supra. His suspicions further aroused by this use of legal language, the officer asked a second dep-

uty to perform an exterior free air sniff of the vehicle with his drug dog. Id. At this time, only two to three minutes had elapsed since the initial stop. The dog alerted to the driver's side door, and the first officer searched the vehicle. The glove compartment was locked; the officer obtained the key and found a brown paper bag containing suspected cocaine.

In upholding the denial of the motion to suppress in *Warren*, we noted that

> The request to search was made immediately after [the officer's] encounter [with the passenger], and neither the request nor the questioning of the passenger unreasonably prolonged the detention. . . . The dog was already present on the scene, and [the driver] and [the passenger] therefore were not detained for the purpose of bringing a drug dog to the scene to investigate. The drug dog's exterior free air sniff . . . did not intrude into the interior of the car. . . . [T]he alert of a trained narcotics dog, standing alone, [is] sufficient to provide probable cause for the search of a vehicle.

(Citations and punctuation omitted.) Id. at 55 (2).

Here, after observing the driver's nervousness and strange behavior, the officer had a strange encounter with him over the insurance card similar to the encounter in *Warren* over the vehicle registration. There ensued some questioning that, as in *Warren*, did not unreasonably prolong the detention, and immediately thereafter, as in *Warren*, the officer asked for permission to search the vehicle. After permission was apparently denied (in *Warren* it was only partially denied), the officer performed an exterior free air sniff with a drug dog that was already present on the scene. The use of the drug dog here occurred less than five minutes after Davidson's return from the tree line, similar to the two to three minutes in *Warren*.

Also as in *Warren*, the dog's exterior free air sniff did not intrude into the interior of the car. See *Rogers v. State*, 253 Ga. App. 863, 865 (1) (560 SE2d 742) (2002) ("The . . . driver of an automobile has no reasonable expectation of privacy in the airspace surrounding his car. . . . [T]he drug dog's sniffing of the exterior of the vehicle did not constitute a search within the meaning of the Fourth Amendment. . . ."). Finally, as in *Warren*, the dog's alert provided probable cause for the ensuing search. Accordingly, this claim of error fails.

2. Davidson claims that the trial court erred in ruling that the chain of custody of the cocaine was established. The arresting officer, upon finding the bags of suspected cocaine in the envelope in the glove compartment of the car Davidson was driving, placed the material in the trunk of his patrol car. Upon arrival at the sheriff's depart-

ment, he properly bagged the drugs, took a photograph of them, and placed them in the evidence locker to be turned in to the evidence custodian. He signed a Property and Evidence Record showing he relinquished two bags of white powder having a weight of approximately 269.3 grams to locker number five. He did not put any identification marks on the bags. The only individuals with access to that locker were the evidence custodian, who was part of the investigations division of the sheriff's department, and the supervisor of that division.

On the same day, the evidence custodian removed the bags from the locker and placed them in the drug file in the evidence room. The only individuals with access to that room were, again, the custodian and the supervisor. The custodian did not put any markings on the bags. Approximately two months later, the evidence custodian turned the bags over to a person at the crime laboratory, although, when testifying at trial three years later, he did not recall the identity of that person.

The crime lab employee who took them from the lab lockbox wrote a lab case number and his initials on them at the time he took them. That employee's employment at the lab later ceased, and another lab employee was given a box of the first employee's "uncompleted evidence" to analyze. The first employee had never opened the bags, and there was no evidence of tampering. The second employee was the only person to have access to the bags after receiving them. He was unsure of the identity of the individual from whom he received them.

Approximately a year and a half after the bags arrived at the lab, the second employee analyzed their contents and determined their aggregate weight as 249.9 grams. He always checks to make sure the lab case number on the evidence matches what is in the lab computer. After cutting the bags to remove samples of their contents for analysis, he taped over the cuts and wrote on the tapes the current date, the lab case number, his initials, and "A" on the tape on one bag and "B" on the tape on the other. He brought the bags to the trial. In 1998 several people were fired from the lab for mishandling and mislabeling evidence, but the first employee was not one of them.

We recently reiterated the chain of custody standard in *Riddles v. State*, 251 Ga. App. 525, 527 (2) (554 SE2d 737) (2001), a case in which the crime lab chemist did not personally receive the marijuana from the drug enforcement officer and was not the only person with access to the evidence vault. There, in finding that the chain of custody had been established, we quoted the following from *Johnson v.*

*State*, 271 Ga. 375, 382 (13) (519 SE2d 221) (1999), cert. denied, 528 U. S. 1172 (120 SC 1199, 145 LE2d 1102) (2000):

> [W]hen blood samples are handled in a routine manner and nothing in the record raises a suspicion that the blood sought to be admitted is not the blood tested, the blood is admissible and the circumstances of each case need only establish reasonable assurance of the identity of the sample. Absent affirmative evidence of tampering, mere speculative doubt as to the handling of evidence while in the possession of the Georgia Crime Lab is a matter for consideration by the jury.

*Riddles*, supra; see also *Armstrong v. State*, 274 Ga. 771, 772 (2) (560 SE2d 643) (2002) ("When the State seeks to introduce into evidence an item that is subject to the chain of custody rule, it must establish with reasonable assurance that the item seized is the same as the item being offered into evidence.") (footnote omitted); *Givens v. State*, 214 Ga. App. 774-775 (2) (449 SE2d 149) (1994) (lack of testimony by crime lab employee who originally received exhibits does not break the chain of custody).

Davidson relies on the fact that the crime lab weight (249.9 grams) is less than that ascertained by the sheriff's department (269.3 grams). Even assuming this point was preserved for review, the crime lab weight is only approximately 7.2 percent less than that of the sheriff's department. In *Richards v. State*, 189 Ga. App. 146, 147 (1) (375 SE2d 278) (1988), we found the chain of custody not broken where "[a]lthough . . . the laboratory receiv[ed] a weight [of a cocaine sample] approximately one ounce greater than was recorded as sent, there is no evidence suggesting that this was caused by tampering or that it was anything other than a weighing or recording error." Neither do we find the discrepancy in weights here to be material. *Langham v. State*, 196 Ga. App. 71 (1) (395 SE2d 345) (1990).

Davidson also relies on *Meeks v. State*, 150 Ga. App. 170 (257 SE2d 27) (1979). There "[t]he container of marijuana was never marked, the officer could not recall what it looked like, and there may have been other such containers in his briefcase." Id. at 171. In Davidson's case, however, the bags had been marked before being put into the box with other uncompleted evidence. We thus find no error in the trial court's ruling that the chain of custody of the cocaine was established.

*Judgment affirmed. Blackburn, C. J., and Johnson, P. J., concur.*

DECIDED SEPTEMBER 4, 2002.

*William D. Healan III*, for appellant.
*Timothy G. Madison, District Attorney*, for appellee.