## A00A0021. PAYNE v. THE STATE.

(536 SE2d 791)

BARNES, Judge.

After Andre Payne was convicted of trafficking in cocaine, he was sentenced to a $200,000 fine and 25 years to serve, 15 years in the penitentiary and the remainder on probation. Contending that the trial court erred by denying his motion to suppress the cocaine that he alleges was seized in an illegal search, Payne appeals.

Payne contends the trial court erred by finding that he had consented to the search of his car because his consent was not voluntary, but was coerced. Payne maintains that he refused to consent to the search on three or four occasions and further contends that the deputy lacked articulable suspicion sufficient to warrant Payne's detention or arrest. For the reasons stated below, we must reverse Payne's conviction.

1. In *Tate v. State*, 264 Ga. 53 (440 SE2d 646) (1994), our Supreme Court reiterated an appellate court's responsibilities when reviewing a motion to suppress.

> When an appellate court reviews a trial court's order concerning a motion to suppress evidence, the appellate court should be guided by three principles with regard to the interpretation of the trial court's judgment of the facts. First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge "hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it." *State v. Swift*, 232 Ga. 535, 536 (207 SE2d 459) (1974). Second, the trial court's decision with regard to the "questions of fact and *credibility* . . . must be accepted unless clearly erroneous." *Woodruff v. State*, 233 Ga. 840, 844 (213 SE2d 689) (1975). (Emphasis supplied.) Third the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment. *Anderson v. State*, 133 Ga. App. 45, 47 (209 SE2d 665) (1974).

Id. at 54 (1). In reviewing a trial court's decision on a motion to suppress, an appellate court's responsibility is to ensure that there was a substantial basis for the decision. *Morgan v. State*, 195 Ga. App. 732, 735 (3) (394 SE2d 639) (1990). As the evidence at the suppression hearing was undisputed and no question existed about the witness' credibility, we will conduct a de novo review of the trial court's application of the law to the uncontested facts. *Hughes v. State*, 269 Ga. 258, 259 (1) (497 SE2d 790) (1998).

2. The Fourth Amendment applies to all seizures of the person, including those that involve only a brief detention of the person short of a traditional arrest. *Terry v. Ohio*, 392 U. S. 1, 16-19 (88 SC 1868, 20 LE2d 889) (1968). Fourth Amendment rights, however, may be waived by voluntarily consenting to search, and a valid consent to search eliminates the need for both probable cause and a search warrant. *Walton v. State*, 194 Ga. App. 490, 492 (2) (390 SE2d 896) (1990). When the State relies upon consent, it has the burden of showing that the consent was voluntary, and not the result of express or implied duress or coercion. *Lombardo v. State*, 187 Ga. App. 440, 441 (1) (370 SE2d 503) (1988).

3. The officer had probable cause to stop and detain Payne initially because he saw Payne following the vehicle ahead of him too closely. See *Verhoeff v. State*, 184 Ga. App. 501, 503 (2) (362 SE2d 85) (1987). At least three kinds of police-citizen encounters are authorized: "verbal encounters involving no coercion or detention; brief 'stops' or 'seizures' which must be accompanied by a reasonable suspicion; and 'arrests' which must be supported by probable cause." Id. This determination, however, does not end our inquiry because the contraband was not discovered through this stop of the vehicle. Instead, the State contends that the contraband was discovered through a legitimate consent search.

4. Viewed most favorably to uphold the trial court's ruling on the motion, the evidence, and in particular a videotape of the incident, shows that Payne was traveling on a highway in Mitchell County about 1:30 in the afternoon when he was stopped by a deputy sheriff for following too closely. Although initially and promptly deciding to give Payne a warning ticket, the deputy then asked Payne whether weapons, contraband, marijuana, and cocaine were in his car. Payne apparently denied having any of these things.

After the deputy asked, "Do you have any objection for me searching your car real quick for any marijuana or cocaine," the following discussion occurred, which we quote at length for context:

PAYNE: Yes. I'm kind of in a hurry.
DEPUTY: I understand that.
PAYNE: Yes, I mean I have objection to you searching the

car.

DEPUTY: Is there any marijuana or cocaine in your car?

PAYNE: No. (Inaudible.) I just got my license back.

DEPUTY: Sir? What did you get your license back for?

PAYNE: I had a ticket.

DEPUTY: Step back for me, okay? There is no luggage in the front of your car? Okay, you understand that I have the option of retaining you until I get a canine here, right? Rather than go through all of those things, if you are staying straight with me, when I say search the car, I basically just want to open and look. I don't want to go through and take all of your compartments open and look. I won't delay you but five minutes.

PAYNE: (Inaudible response.)

DEPUTY: I understand what you're saying.

PAYNE: I'm really in a hurry that's why I wasn't speeding or anything and I didn't know I was trailing people.

DEPUTY: Well, okay. Stand right there in front of the car for me. Lift up your shirt for me. You told me several different conflicting stories, conflicting stories, right here, okay?

PAYNE: (Inaudible.)

DEPUTY: Well, I'm telling you what I think and what you told me and I am saying that based on what you told me. *At this point, now, you are no longer free to go.* And do an about face. You can put the wallet and stuff back in your pocket.

PAYNE: What?

DEPUTY: You can put your wallet and stuff back in your pocket. The dog is on the way out here. You don't have any weapons in your pocket, do you? Spread your legs for me. I ain't going to put no handcuffs on you but jump in the back seat of the car. Jump in the back seat. Shut that door. *Is it worth this wait?*

. . .

PAYNE: I mean, really, I am in a hurry. I was supposed to be there. (Inaudible.)

DEPUTY: It won't take me a couple of minutes, man, to cut you loose.

PAYNE: (Inaudible response.)

DEPUTY: Well, do you want me to call the dog or are you going to allow me consent? [Apparently a radio call.] Cut me case card and show at this time subject is being detained. You have a beeper number CI-6? How about contacting him and having him en route. At this time show this person is

being detained. Do you have a beeper number for a Canine, CI-6? Ask him to be en route to my location. Now, you said something?

PAYNE: How long is this going to take to search my car?

DEPUTY: Well, case law, it has been proven that its held up in court — there have been cases where it's taken a dog up to 45 minutes to get on the scene and held up in court, that's the reasonable amount of time. (Inaudible.) It wouldn't take me more than five minutes. Well, basically, I done told you it wouldn't take me more than five minutes.

PAYNE: (Inaudible response.)

DEPUTY: I just called the dog, but you really got me tripping, now.

PAYNE: I'm sorry. I didn't know that. (Inaudible.)

DEPUTY: I understand that, too, but there are certain things that we need to look for as indicators and that's what I have done and I have observed a number of indicators on you. *And those indicators usually lead, in most cases, probably a person of some type of concealment.*

PAYNE: (Inaudible response.)

DEPUTY: I don't want you to feel like you are being threatened in any way or anything but this is just procedure. Now, *if you want to go on out there and we do a quick search of your car, either way it's fine with me but either way, I have enough probable cause to search your car; that's either with your consent or either without your consent, your car is going to be searched.* Okay? Now, you got in trouble when?

PAYNE: I got in trouble in the early '90's —

DEPUTY: For what?

PAYNE: Weed.

DEPUTY: How much? How much? Is there any weed in that car, now?

PAYNE: No.

DEPUTY: As long as we get confirmation from CI-6? As soon as you get confirmation with the canine unit, please advise me. (Deputy radios dispatch.) I want you to get straight with me, man.

PAYNE: (Inaudible response.)

DEPUTY: Any large sums of money in the car?

PAYNE: (Inaudible response.)

DEPUTY: If I understand, now, you give me your consent to search the car? (Deputy talks with dispatch.)

THE COURT: If that's what he said, I didn't hear it. Run that back. I didn't catch it. I could not understand that. Were you picking that up?

COURT REPORTER: I'm going to say, on the record, that I can't certify what the witness is saying because I can't hear it all. But I'd be glad to transcribe the portions that I can hear. But I could not understand because when he is not in the microphone, I can't hear it.

DEPUTY: I understand now you give me consent to search the car, is that the case here?

PAYNE: (Inaudible response.) I'm against it.

DEPUTY: *I have reason to believe there is some type of contraband in your vehicle, okay?* Now, it could happen and I asked for permission to search your car, okay? It can go one or two ways. You can tell me yes or no. You can tell me yes and then we go ahead and do it that way or you can tell me no and I probably have enough probable cause to go before a judge, in this case I feel like I do, I can retain you and call the dog out here and that's what I have done. But, now, at any time you can give consent if that's what you decide to do. Do you want to continue to wait?

. . .

PAYNE: No, let's give it a quick search.

DEPUTY: Now, at this point now, I'm going to put some handcuffs on you in the front and you can stand in front of your car while I do a quick search of your vehicle.

PAYNE: You'll handcuff me in the front?

DEPUTY: I'll handcuff you in the front.

PAYNE: (Inaudible response.)

DEPUTY: You need to stand there outside your car. You need to stand there with me. You don't want me going through your car by myself, do you?

PAYNE: I don't want to stand on the side — (Inaudible.)

DEPUTY: I mean, you can just stand there and wave. People won't know you have handcuffs on. It's totally up to you. Put your hands out right there. Walk up to the front of your car. Just step up there for me. You can just kind of hang loose right there or whatever, okay? Where your car keys go to? I'm going to advise you on the canine, I'm going to go ahead with the search, consent search. Stand right there in front of the car for me, okay. What is your name again? Does this key go in your pocket? Let's go. Let's go. Right on back there, right back. [Apparently, a radio call] Have Chris to route my location and tell him to get that jail car.

(Emphasis supplied.)

At the motion to suppress hearing, the videotape was augmented with the deputy's live testimony. He testified that he stopped Payne for following too closely. He also testified that Payne was not free to go before the search because,

There were several indications of articulable suspicions. First suspicion being that immediately after I made a traffic stop on Mr. Payne. While sitting in my patrol car, I could observe that there was only one occupant in that car and observed in that vehicle as I could see the driver laying in across the front passenger — laying out across the front — seeing that the vehicle extending over to the passenger side of the vehicle. Upon Mr. Payne exiting the vehicle, during the traffic stop, another articulable suspicion was that he immediately handed me the rental agreement to the vehicle as to show me that the vehicle does not belong to him. A third suspicion was the nervousness of the driver. Upon trying to retrieve his driver's license, his hands were shaking. He was dropping items from his wallet. The driver appeared to stay away from me as to not get close. As I took steps toward Mr. Payne, he would immediately take steps away or sidestep or things of that nature. Also, the eye contact. When I asked Mr. Payne questions as to his name or things of that nature, he would look me in the eye and give me a good answer. But when I asked Mr. Payne questions about his whereabouts or things of that nature, Mr. Payne had to look to the ground or look away before answering those questions. The sixth suspicion was that the body language of Mr. Payne, he was constantly shuffling around, not standing in one place, what we call the handcuffed position. He was always placing his hands together either above his head or behind his back or to his front or in a position as to being handcuffed.

According to the deputy, the police believe this subconscious movement is the person placing themselves under arrest; according to the deputy, they refer to it as "the handcuffed position." The deputy continued,

Also, another articulable suspicion was that when I advised Mr. Payne of the violation for the traffic stop, Mr. Payne told me that he knew he wasn't speeding so he wanted me to explain that he was following too close to him so he would make sure he wouldn't get stopped for it again in detail.

The deputy also testified that Payne gave him three different

stories, three different times. The deputy said that Payne first told him he was going to pick up his girlfriend on a family emergency and then changed to saying he was going to pick her up for a football game, and then changed it back to a family emergency. Additionally, the deputy was not satisfied with Payne's story about the football game because Payne could not tell him whom his team was playing. The deputy's tenth articulable suspicion was that Payne could not produce a student ID when he told the deputy that he was a full-time student. The deputy was also suspicious because Payne first said he was a full-time student and then said he was not.

The deputy's "twelfth and final articulable suspicion" was that,

> Mr. Payne himself hadn't rented the car out of Miami, Florida, and it kind of seemed strange for him to be en route to Sylvester, Georgia, and not have any luggage in the car. You know, not a change of clothes or anything. And based on those suspicions, I felt like I had enough suspicion to detain Mr. Payne and get a canine out on the scene for a canine search of the vehicle.

At the conclusion of the hearing on the motion to suppress, the trial court ruled that the deputy had probable cause to stop Payne because he was following the vehicle ahead of him too closely. The court also found that Payne, "in fact, voluntarily gave his consent to the officer to search his vehicle." The court further noted,

> In any event, while the search was being conducted the defendant's conduct also showed to me in that what the Court considers to be his consent by not objecting. At that time also there was a discussion of where the handcuffs would be, where he could be, and, you know, there was — it — everything he did indicated consent. And for this reason, I'm going to — for these reasons, I'm going to deny the motion to suppress.

Later, at Payne's request, the trial court filed written findings of fact and conclusions of law that in substance, but not entirely, followed these comments. In some respects the order, prepared by the prosecutor, embellished the trial court's comments.

During Payne's trial, additional evidence was presented on this issue.

> DEFENSE COUNSEL: You have walked up to his car. He was under arrest. You're no longer free to go. You looked in his car. You didn't see any drugs in plain view, did you, sir?
> DEPUTY: No, sir, I did not.

DEFENSE COUNSEL: Well, what suspicion of contraband were you able to place him under arrest for at that point?
DEPUTY: *At that point there were none.*
DEFENSE COUNSEL: You just told us that he was under arrest for suspicion of contraband. How can he be under arrest for suspicion of contraband, sir, if there was nothing?
DEPUTY: Based on the, based on the numerous articulable suspicions that I had, I had developed enough probable cause to detain Mr. Payne. There's, there's no warrant for suspicion.
DEFENSE COUNSEL: I'm sorry. [Deputy], we're beyond that point. We're at the point where you have told him, you are no longer free to go.
DEPUTY: That's correct.

. . .

DEFENSE COUNSEL: You testified that at the time that you had him lift up his shirt he was no longer free to go; is that right?
DEPUTY: That's correct.
DEFENSE COUNSEL: And you testified that at that point he was under arrest for something and what I'm asking you simply, sir, is: What was he under arrest for at that point?
DEPUTY: At that point he was under arrest for, for the numerous articulable suspicions that had been developed.
DEFENSE COUNSEL: Where in the Georgia code does it say that you can arrest somebody for articulable suspicions of any type?
DEPUTY: I can't just tell you.
DEFENSE COUNSEL: Did you see a crime being committed, sir?
DEPUTY: I had enough probable cause to believe that there was one being committed, sir.
DEFENSE COUNSEL: Did you see a crime being committed, sir?
DEPUTY: No, sir, I did not.

. . .

DEFENSE COUNSEL: [A]t the time that you placed Mr. Payne under arrest, told him that he was no longer free to go and told him to lift his shirt, he was not under arrest for following too closely, was he?
DEPUTY: No, he was not.
DEFENSE COUNSEL: And you hadn't seen any drugs yet

so he wasn't under arrest for drugs, right?

DEPUTY: No, he was not.

DEFENSE COUNSEL: Well, what crime was it that he was under arrest for?

DEPUTY: Based on the articulable suspicions Mr. Payne was under arrest for a further investigation.

(Emphasis supplied.)

Upon further examination by the prosecutor, the deputy testified that it did not make any difference to him whether Payne consented or not because he was waiting for the canine unit to arrive to do an "air search" of the car. During the trial, Payne testified that he was coerced into giving his consent to search.

5. We cannot sustain this search. The videotape speaks for itself. Payne's consent to the search of his vehicle was extracted only after he had many times refused to give it. This so-called consent, at best, was merely an acquiescence to authority. The deputy told him that his car would be searched regardless; in effect, Payne was merely allowed to choose his poison. Further, if an officer represents that a search warrant will be secured should consent be refused, and does not have probable cause for a search warrant, the accused's consent is invalid. *Solomon v. State*, 236 Ga. App. 778, 780 (2) (513 SE2d 520) (1999); *Darby v. State*, 216 Ga. App. 781, 783 (2) (455 SE2d 850) (1995).

As the videotape and the deputy's testimony show, probable cause to search Payne's vehicle did not exist.

> Probable cause to search an automobile exists when the facts and circumstances before the officer are such as would lead a reasonably discreet and prudent man to believe that the contents of the vehicle offend the law. The test of probable cause requires merely a probability — less than a certainty but more than a mere suspicion or possibility. A suspicion or strong reason to suspect is an insufficient foundation for a finding of probable cause.

(Citation and punctuation omitted.) *Brown v. State*, 269 Ga. 830, 831-832 (1) (504 SE2d 443) (1998).

Moreover, this search cannot be justified as part of a valid *Terry* detention. See *State v. Hanson*, 243 Ga. App. 532 (532 SE2d 715) (2000) (physical precedent). An investigatory detention is constitutional when the police officer can point to specific, articulable facts that the person stopped is, or is about to be, involved in criminal activity. *Terry v. Ohio*, supra, 392 U. S. at 21; *United States v. Cortez*, 449 U. S. 411, 417 (101 SC 690, 66 LE2d 621) (1981). The deputy

must have had a particularized and objective basis for suspecting Payne of criminal activity. Id. at 418. "This demand for specificity in the information upon which police action is predicated is the central teaching of Fourth Amendment jurisprudence." (Citation and punctuation omitted.) *McSwain v. State*, 240 Ga. App. 60, 61 (522 SE2d 553) (1999). It is obvious from the videotape and the deputy's testimony that the deputy had no particularized, objective basis for detaining Payne. His "articulable suspicions" either individually or collectively do not point to a particularized and objective basis for suspecting that Payne was, or was about to be, engaged in criminal activity. *Peters v. State*, 242 Ga. App. 816 (531 SE2d 386) (2000).

Because Payne was detained without a legal basis, his detention was an unlawful arrest. *Williams v. State*, 251 Ga. 749, 792 (8) (ii) (312 SE2d 40) (1983). Accordingly, as the search of Payne's car was not authorized, the trial court's decision on his motion to suppress the evidence seized in the unlawful search must be reversed. *Brown v. State*, supra, 269 Ga. at 834.

*Judgment reversed. Blackburn, P. J., and Eldridge, J., concur.*

DECIDED JUNE 30, 2000.

*Rodney M. Keys*, for appellant.

*J. Brown Moseley, District Attorney, Victoria Spear-Darrisaw, Assistant District Attorney*, for appellee.