## A05A1367. ROSAS v. THE STATE.

(624 SE2d 142)

PHIPPS, Judge.

Julio Rosas was traveling in an automobile driven by Juan Garcia Vazquez when they were stopped for a traffic violation by a Carroll County deputy sheriff. The deputy asked Rosas and Vazquez a few questions, obtained their driver's licenses, went back to his patrol car and ran a radio check, returned to their car, asked them to step out of it, and obtained consent to search the vehicle. Approximately 11 pounds of methamphetamine having a street value of about $1 million was found during the search. Rosas contends that the consent to search was the product of an illegal detention because it was obtained after the traffic stop had been transformed into an investigation for contraband unsupported by reasonable, articulable suspicion. The trial court disagreed with this contention and denied Rosas's motion to suppress. We affirm.

Where, as here, the evidence relating to a motion to suppress is uncontroverted and no question regarding witness credibility is presented, an appellate court conducts a de novo review of the trial court's application of law to the undisputed facts.[1]

Evidence introduced at the motion to suppress (and trial) showed the following: On January 4, 2003, Rosas and Vazquez were traveling eastbound on Interstate 20 in a late-model two-door Honda when they were stopped by Carroll County Deputy Sheriff Chad Sheriff after he had observed the Honda following the vehicle in front of it too closely. During the search of the Honda, a large quantity of methamphetamine was found. Rosas and Vazquez were charged with trafficking in pure methamphetamine. During their joint trial, the charge was reduced to simple possession of the drug because the state's chemical analysis of the drug showed that it was a mixture. Both Rosas and Vazquez were convicted.

The traffic stop was recorded on videotape. It shows that Sheriff stopped the Honda at about 8:19 a.m. He exited his patrol car, approached the passenger side of the Honda, explained the reason for the stop, asked Rosas and Vazquez if they were tired, and suggested that they allow more space between the Honda and the next vehicle on the road. Sheriff then asked for driver's licenses and proof of insurance. He also inquired into the ownership of the car, whether Rosas and Vazquez were friends, and how long they had been driving. At about 8:21, Sheriff returned to his patrol car and ran the radio check. At 8:27, while still in his patrol car, he announced his intent to

---

[1] *Hughes v. State*, 269 Ga. 258, 259 (1) (497 SE2d 790) (1998).

search the vehicle. At 8:29, he returned to the Honda, and asked Rosas and Vazquez to step out of the car.

While still in possession of their driver's licenses, Sheriff began questioning them about an airplane flight from Mexico City to Atlanta. At 8:31, Carroll County Sheriff's Department Sergeant Cliff Meyer appeared on the scene. Sheriff thereupon asked for and obtained permission to search the car. At 8:32, the search began.

Testimony provided by Sheriff further explained the circumstances surrounding the stop and search. According to Sheriff, the Honda slowed down and began following the vehicle in front of it at a safe distance as soon as the driver of the Honda noticed Sheriff. Before effecting the stop, Sheriff followed the Honda for about one and one-half to two miles. The car had a California license plate. He did not observe any other traffic violations. After stopping the Honda, Sheriff ascertained that Vazquez was operating the car and that Rosas was seated in the front passenger seat. Vazquez produced a State of Washington driver's license and an insurance card showing that the Honda belonged to an absent third party. Rosas produced a California driver's license. Rosas and Vazquez informed Sheriff that before arriving in Georgia, they had been sleeping in a rest area at the Georgia-Alabama state line. Sheriff also observed a blanket and pillow on the back seat and fast food wrappers on the floorboard, indicating to Sheriff that Rosas and Vazquez "intended to stay on the road, taking turns driving." Sheriff additionally observed that the armrest in the back seat of the relatively new car on the driver's side appeared to have been removed and reattached improperly. In addition, Sheriff testified that Rosas and Vazquez would not maintain eye contact with him, and that they both appeared unusually nervous.

Sheriff then returned to his patrol car to run a radio check on both Rosas and Vazquez through a federal database known as the El Paso Intelligence Center (EPIC) in El Paso, Texas. Sheriff testified that he ran this check through EPIC because it enabled him to obtain information on offenses such as drug smuggling and car theft, and he suspected "that there was a crime happening beyond a traffic stop." Therefore, Sheriff opted not to run a license check on Rosas and Vazquez through the local dispatcher. Sheriff acknowledged that one of the things that aroused his suspicions was the fact that the individuals he had stopped were Hispanic. By contacting EPIC, Sheriff discovered that there were no outstanding warrants on either Rosas or Vazquez and that, during the past year, Vazquez had flown round trip from Atlanta to Mexico City once. That heightened Sheriff's suspicions. After getting out of the car, Vazquez consented to the search. In conducting the search, Sheriff found the methamphetamine in packages in the fender wells of the car underneath the rear seat armrests.

Sergeant Meyer testified that one of the modern trends in drug trafficking is the use of two-door vehicles with large rear-quarter panels that create spacious hidden compartments overlaid by removable molding, so that drugs can be transported in the cars' interiors. The Honda was such a vehicle.

Based on Sheriff's testimony, and taking notice of certain trends in drug trafficking cases based on its knowledge of facts in cases in its jurisdiction, the court identified essentially five indicators that Sheriff had observed which, in the court's opinion, provided reasonable suspicion: (1) the Honda belonged to a third party, and drug traffickers often drive vehicles that belong to others; (2) the Honda bore a California license plate, and California is a source state for drug smuggling; (3) drug traffickers often drive continuously on the road making only minimal stops for food and rest; (4) the armrest on the relatively new car had been tampered with; and (5) Rosas and Vazquez were unusually nervous.

1. Rosas first contends that the trial court erred in denying his motion to suppress.

Three sequential questions present themselves: (a) Was Sheriff justified in stopping Rosas and Vazquez?[2] (b) If so, did the facts observed by the officer during the stop give rise to a reasonable, articulable suspicion of criminal activity other than the traffic violation? (c) If not, was the consent to search the product of an illegal detention?

(a) Sheriff was justified in stopping Rosas and Vazquez.

The legality of the stop itself is measured by "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time."[3] The validity of the stop, thus, depends "on what the driver was doing and what that reasonably conveyed to the officer, not on what else the officer thought might be occurring."[4] Unquestionably, therefore, Sheriff was authorized to stop and detain Rosas and Vazquez initially because he saw the Honda following the vehicle ahead of it too closely.[5]

(b) We conclude that the facts observed by Sheriff during the stop gave rise to a reasonable, articulable suspicion of criminal activity other than the traffic violation and, therefore, authorized him to detain and question Rosas and Vazquez for reasons unrelated to the stop.

---

[2] *Berry v. State*, 248 Ga. App. 874, 879 (1) (547 SE2d 664) (2001).

[3] *Larochelle v. State*, 219 Ga. App. 792, 796 (4) (466 SE2d 672) (1996) (citation and punctuation omitted).

[4] Id.

[5] *Payne v. State*, 244 Ga. App. 734, 735 (3) (536 SE2d 791) (2000).

An officer who questions and detains a suspect for reasons other than those connected with the original purpose of the stop exceeds the scope of permissible investigation unless he has reasonable suspicion of other criminal activity. This reasonable suspicion must be based on more than a subjective, general suspicion or hunch. The detention must be justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the detention. . . .[6]

"The [officer] must have had a particularized and objective basis for suspecting [the defendant] of criminal activity. [Cit.]"[7] "The suspicion must be one that provides a 'basis from which the court can determine that the detention was not arbitrary or harassing.' [Cit.]"[8] Whether a given set of facts rises to the level of reasonable suspicion is a legal question.[9]

We have consistently held that "nervousness alone" is not sufficient to establish reasonable suspicion to detain and investigate illicit drug activity.[10] Nor have we found reasonable suspicion in cases in which, in addition to nervousness: a car was being operated along an interstate highway commonly used for transportation of drugs (*Montero v. State*[11]); the driver and passenger were operating a car that had been rented to an absent third party (*Simmons v. State*[12]); none of the occupants of the car produced any proof of ownership, and the back seat passenger was clutching a black bag (*State v. Blair*[13]); various statements given by the occupants of the car contained no meaningful inconsistencies (*Migliore v. State*[14]); the defendant was driving a rental car, he had made a long trip into Georgia from another state only to stay a few hours, and there was a plastic garbage bag in the

---

[6] *Vaughn v. State*, 263 Ga. App. 536, 539-540 (588 SE2d 330) (2003) (citation and punctuation omitted); *Faulkner v. State*, 256 Ga. App. 129, 130 (567 SE2d 754) (2002) (citation and footnote omitted).

[7] *Payne v. State*, supra, 244 Ga. App. at 742-743 (5).

[8] *State v. Kwiatkowski*, 238 Ga. App. 390, 392 (519 SE2d 43) (1999).

[9] *Jones v. State*, 253 Ga. App. 870, 873 (560 SE2d 749) (2002).

[10] *Gonzales v. State*, 255 Ga. App. 149, 150 (564 SE2d 552) (2002); see, e.g., *State v. Cunningham*, 246 Ga. App. 663, 666 (541 SE2d 453) (2000); *Parker v. State*, 233 Ga. App. 616, 618 (1) (504 SE2d 774) (1998).

[11] 245 Ga. App. 181, 183 (537 SE2d 429) (2000).

[12] 223 Ga. App. 781, 782 (2) (479 SE2d 123) (1996).

[13] 239 Ga. App. 340 (521 SE2d 380) (1999).

[14] 240 Ga. App. 783 (525 SE2d 166) (1999).

back seat (*Berry v. State*[15]); and the defendant was driving a rental car, was traveling from Florida, and had no luggage (*Payne v. State*[16]).

Factors such as these have been described as "frequent occurrences in our highly mobile society[,]"[17] and, for the most part, mirror those present in this case. Yet, we must be mindful that "[t]o determine whether a reasonable articulable suspicion exists, courts must look to the totality of the circumstances[,]"[18] and that "[n]o mathematical formula exists for deciding whether the totality of the circumstances provided the officer with an articulable or particularized suspicion that the individual in question was involved in criminal activity."[19]

We have recognized that in determining whether there is a particularized and objective basis for suspecting criminal activity, officers may take into consideration "the modes or patterns of operation of certain kinds of lawbreakers" and, from such data, "a trained officer [may] draw[ ] inferences and make[ ] deductions . . . that might well elude an untrained person."[20] Here, evidence showed that, as part of their present-day mode of operation, drug traffickers often transport their wares in vehicles such as the one being used here. And Sheriff observed that the relatively new vehicle he had stopped seemed to have been altered by the removal and reattachment of the armrest. Along with the other factors present, these specific indicators that the vehicle was being used for the unlawful purpose suspected by the officer sufficed to render the officer's suspicion neither arbitrary nor harassing. Although each of the factors present in this case "alone may have been insufficient, the convergence of them at one time sufficed."[21]

(c) Moreover, even if no reasonable suspicion of drug activity had existed, the consent to search would not have been the product of an illegal detention.

An officer who lacks reasonable suspicion of other criminal activity exceeds the scope of a permissible investigation of a traffic offense only if he continues to detain and interrogate the subject, or seeks consent to search, after the conclusion of the traffic stop or after the tasks related to the investigation of the traffic violation have been

---

[15] Supra, 248 Ga. App. at 881 (4).

[16] Supra, 244 Ga. App. at 735-743 (4), (5).

[17] *State v. Kwiatkowski*, supra, 238 Ga. App. at 393.

[18] *Evans v. State*, 262 Ga. App. 712, 716 (1) (b) (586 SE2d 400) (2003).

[19] *New Jersey v. Davis*, 517 A2d 859, 867 (N.J. 1986).

[20] *Blount v. State*, 257 Ga. App. 302, 303 (570 SE2d 705) (2002) (punctuation omitted), citing *United States v. Cortez*, 449 U. S. 411, 417-418 (101 SC 690, 66 LE2d 621) (1981).

[21] *Almond v. State*, 242 Ga. App. 650, 653 (1) (530 SE2d 750) (2000) (footnotes omitted).

accomplished.[22] An officer conducting a routine traffic stop may request and examine a driver's license and vehicle registration and run a computer check on the documents,[23] and check for outstanding warrants or criminal histories on the vehicle's occupants.[24] Those are essentially the things Sheriff did here, although they may not have all been done as part of his routine procedure. And out of concern for safety, an officer making a traffic stop may also order the driver and any passengers out of the vehicle.[25] Therefore, although Sheriff ordered Rosas and Vazquez out of the vehicle in order to ask for consent to search it, his actions were not objectively unreasonable. And the stop was relatively brief. In *State v. Bibbins*,[26] a majority of this court held that where an officer's duties relative to a traffic stop are being diligently pursued so that the detention was not unduly prolonged beyond the measure of time necessary to issue a citation, merely asking for consent to search is not a Fourth Amendment violation even though, under *Daniel v. State*,[27] the stop has not become a consensual encounter. Consequently, the court did not err in denying Rosas's motion to suppress.

2. Rosas contends that the court erred in overruling his objection to the introduction of evidence of the positive results of tests performed by the state crime laboratory on the methamphetamine.

Rosas argues that the test results were inadmissible because of the state's failure to furnish the crime lab report to him pursuant to his pretrial demand for copies of scientific tests under OCGA § 17-16-4 (a) (4). OCGA § 17-16-4 is part of Georgia's Criminal Procedure Discovery Act.[28] If the state fails to comply with the requirements of the Act, OCGA § 17-16-6 provides that the trial court "may order the state to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the state from introducing the evidence not disclosed or presenting the witness not disclosed." Thus, the sanction of evidence exclusion applies only where there has been a showing of prejudice to the defense *and* bad faith by the state.[29]

The record here shows that the state furnished a copy of the crime lab report to counsel for Vazquez, but mistakenly failed to furnish a copy of the report to counsel for Rosas, even though counsel

---

[22] See *Faulkner v. State*, supra, 256 Ga. App. at 130.

[23] *Rogers v. State*, 206 Ga. App. 654, 657 (2) (426 SE2d 209) (1992).

[24] *State v. Williams*, 264 Ga. App. 199, 202 (590 SE2d 151) (2003).

[25] *Knowles v. Iowa*, 525 U. S. 113, 118 (119 SC 484, 142 LE2d 492) (1998).

[26] 271 Ga. App. 90 (609 SE2d 362) (2004).

[27] 277 Ga. 840, 841 (1) (597 SE2d 116) (2004).

[28] OCGA § 17-16-1 et seq.

[29] *Tucker v. State*, 222 Ga. App. 517, 518 (3) (474 SE2d 696) (1996).

for Rosas was furnished with a witness list showing that the chemist employed by the state crime laboratory would testify at trial. Finding that the state was not chargeable with bad faith in having failed to furnish the crime lab report to Rosas prior to trial, the court ordered the prosecutor to provide counsel for Rosas with a copy of the report at trial and refused to exclude the results of the report. Although Rosas may have been entitled to a continuance to have the substance independently tested, counsel stated that Rosas would have been prejudiced by having to request one because it could have resulted in a waiver of his demand for speedy trial. Therefore, no continuance was sought or offered. Applying OCGA § 17-16-6, the court nonetheless committed no error in refusing to exclude the test results, as bad faith by the state was not shown.

3. Rosas contends that the court erred in denying his motion for mistrial after a police officer testifying on behalf of the state commented on Rosas's invocation of his right to remain silent after being given his *Miranda* warnings.

A review, however, of the transcript shows that although in testifying before the jury the officer initially indicated that Rosas had refused to make any statements to police and had requested an attorney after being informed of his *Miranda* rights, the officer immediately clarified that it was Vazquez and not Rosas who had requested an attorney. The officer, however, continued to testify that Rosas had refused to make any statements to police, and both Rosas and Vazquez moved for a mistrial at a bench conference. During the bench conference, the prosecuting attorney informed the court that, in fact, he had a tape recording of a pretrial interview in which Rosas had made certain statements to the police that were contradictory to his trial testimony. Because of the confusion created by the officer's testimony, the court refused to admit Rosas's pretrial statements and instructed the jury to disregard testimony that either Rosas or Vazquez had refused to make statements to police. Under these circumstances, we find no abuse of discretion in the court's denial of Rosas's motion for mistrial.

4. Finally, Rosas charges the court with error in denying his motion for directed verdict of acquittal.

Rosas challenges the sufficiency of the evidence to support his conviction in reliance on the rule that

> a finding of constructive possession must be based upon
> some connection between the defendant and the contraband
> other than spatial proximity. Evidence of mere presence at

the scene of the crime, and nothing more to show participation of a defendant in the illegal act, is insufficient to support a conviction.[30]

But here, the totality of the evidence authorized the jury to find that both Rosas and Vazquez were knowingly involved in transportation of the contraband substance and were thus in joint actual or constructive possession of it.[31]

*Judgment affirmed. Andrews, P. J., and Mikell, J., concur.*

DECIDED OCTOBER 14, 2005 —
RECONSIDERATION DENIED NOVEMBER 23, 2005 — ▮

*Allen M. Trapp, Jr.,* for appellant.

*Peter J. Skandalakis, District Attorney, Jeffery W. Hunt, Raymond C. Mayer, Assistant District Attorneys,* for appellee.

---

[30] *Reid v. State,* 212 Ga. App. 787, 788 (442 SE2d 852) (1994) (citation and punctuation omitted).

[31] See *Jones v. State,* 225 Ga. App. 673, 674 (1) (484 SE2d 702) (1997); *Amcrum v. State,* 197 Ga. App. 819 (399 SE2d 574) (1990); compare *Mitchell v. State,* 268 Ga. 592 (492 SE2d 204) (1997); *Wofford v. State,* 262 Ga. App. 291, 292 (1) (585 SE2d 207) (2003); *Reid v. State,* supra.