**FIRST DIVISION**
**PHIPPS, C. J.,**
**DOYLE, P. J, and BOGGS, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**June 11, 2015**

# In the Court of Appeals of Georgia

A15A0099. LEWIS v. THE STATE.                                    DO-005 C

DOYLE, Presiding Judge.

Following a bench trial, Richard Lewis was convicted of possession of less than one ounce of marijuana[1] and possession of a drug-related object.[2] He now appeals from the denial of his motion for new trial, contending that the trial court erred by denying his motion to suppress evidence obtained during a traffic stop. Specifically, Lewis argues that the arresting officer impermissibly prolonged the traffic stop before conducting a free-air sniff search with a trained police narcotics dog and obtaining reasonable suspicion to conduct a non-consensual search of his vehicle. For the reasons that follow, we affirm.

---

[1] OCGA §§ 16-13-2 (b); 16-13-30 (j) (1).

[2] OCGA § 16-13-32.2 (a).

There are three fundamental principles which must be followed when conducting an appellate review of a trial court's ruling on a motion to suppress. First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support them. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment. These principles apply equally whether the trial court ruled in favor of the State or the defendant.[3]

To the extent that "the evidence at a suppression hearing is uncontroverted and the credibility of witnesses is not in question, we conduct a de novo review of the trial court's application of the law to the undisputed facts."[4]

The evidence in this case includes a video recording of the traffic stop as well as testimony from the officers. Viewed in the light most favorable to the trial court's findings, the evidence shows that in July 2012, Officer Jerry Jackson was on patrol

---

[3] (Citations and punctuation omitted.) *Brown v. State*, 293 Ga. 787, 802-803 (3) (b) (2) (750 SE2d 148) (2013), quoting *Miller v. State*, 288 Ga. 286, 286-287 (702 SE2d 888) (2010).

[4] *Jones v. State*, 291 Ga. 35, 36-37 (1) (727 SE2d 456) (2012), citing *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994).

with passenger Officer John Cash in a marked police cruiser on an interstate when Jackson observed a recreational vehicle ("RV") towing a trailer cross the white line on the right side of the roadway. As Jackson followed the RV, he observed it cross the white line two separate times, "almost taking out a construction barrel at one point." Based on the RV's erratic driving, Jackson initiated a traffic stop.

As Jackson approached the RV, the driver, Lewis, placed his empty hands out the driver's window. Jackson spoke to Lewis through the passenger door, due to the heavy highway traffic, and Lewis explained that he had been checking a voice mail on his cell phone, which caused him to weave out of his lane. Jackson requested Lewis's driver's license, which Lewis provided, and asked Lewis for the RV's registration. Lewis explained that he would have to look for it somewhere inside the RV, and Jackson asked Lewis if he could come inside with him while Lewis looked for the paperwork; Lewis declined. The two officers waited outside, while Lewis located the paperwork. At the officers' request, Lewis then joined the officers outside the RV and provided the officers with the registration, and Jackson explained that he was going to write Lewis a warning for failure to maintain his lane. Jackson requested consent to pat down Lewis before he wrote up the warning, which consent Lewis gave, and the pat-down revealed no weapons or contraband.

3

After informing Lewis that he would receive a warning, Jackson requested consent to search the RV, which Lewis denied. Jackson then immediately gave the warning slip to Officer Cash to continue filling out while Jackson retrieved his narcotics dog out of the cruiser. At this point, the written warning had not been completed, and police dispatch had not returned its check of Lewis's license information, which Jackson had requested earlier via radio. As those processes continued, Jackson conducted a free-air search of the RV with the dog, which "alerted" on the trailer and the passenger door of the RV, indicating that he had detected an odor of narcotics. Jackson returned the dog to the cruiser and explained to Lewis that he would be searching the RV. At that point, Lewis confessed that he had a small amount of marijuana under the front seat and a pistol because he carried large amounts of cash from his antler carving business. A search of the RV revealed a small quantity of marijuana under the front seat and in two other locations in the RV, as well as a small smoking pipe. No contraband was found in the trailer.

Based on the contraband found in the RV, Lewis was arrested and charged with possession of the marijuana and the smoking pipe. He moved to suppress the evidence obtained during the search, and the trial court held a hearing. Based on the evidence at the hearing, the trial court found that the dog's free-air search was

4

conducted during the process of writing the warning and checking Lewis's driver's license information – all of which took place within eight minutes of the time Jackson activated his blue lights to initiate the traffic stop. Based on these findings, the court concluded that the traffic stop was not impermissibly prolonged, and the search of the RV was authorized by the suspicion aroused by the trained narcotics dog's behavior.

Thereafter, the court found Lewis guilty in a bench trial, and Lewis now appeals the denial of his motion for new trial, challenging the denial of his motion to suppress.

1. Lewis argues that the trial court erred by denying his motion to suppress because the officers unreasonably prolonged the traffic stop prior to executing the free-air search with the narcotics dog. We disagree.

Lewis does not contest the fact that the initial traffic stop was justified by the officer's observation that Lewis was failing to maintain his lane, which is a traffic violation.[5] As recently explained by the United States Supreme Court in *Rodriguez v. United States*,[6]

---

[5] See OCGA § 40-6-48 (1); *Camacho v. State*, 292 Ga. App. 120, 122 (663 SE2d 364) (2008) ("[n]umerous cases have held that weaving out of one's lane justifies a stop").

[6] *Rodriguez v. United States*, __ U. S. __ (__ SCt __, 191 LE2d 492) (2015).

[a] seizure for a traffic violation justifies a police investigation of that violation. A relatively brief encounter, a routine traffic stop is more analogous to a so-called "*Terry*[7] stop" than to a formal arrest. Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. . .

[A] traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the "mission" of issuing a warning ticket. . . . The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop. An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve

---

[7] *Terry v. Ohio*, 392 U. S. 1 (88 SCt 1868, 20 LEd 2d 889) (1968).

6

the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

A dog sniff, by contrast, is a measure aimed at detecting evidence of ordinary criminal wrongdoing. [Thus,] a dog sniff, unlike the routine measures just mentioned, is not an ordinary incident of a traffic stop. Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission.[8]

Here, the record shows that the dog sniff did not unreasonably prolong the traffic stop because it was conducted before completion of the traffic stop, and it did not hinder the officers' timely completion of the mission of the traffic stop. The dog sniff was initiated by one officer while a second officer finished filling out the written warning and while the officers waited for dispatch to return the check on Lewis's driver's license information. The dog sniff was initiated within six minutes of the moment the officers first made contact with Lewis on the roadside, and it was completed fewer than ninety seconds later. The license check was an "ordinary inquir[y] incident to the traffic stop," and it "serve[d] the same objective as

---

[8] (Citations and punctuation omitted.) Rodriguez, __ U. S. at __ (II).

7

enforcement of the traffic code."[9] Consistent with the holding in *Rodriguez*, "our law is . . . clear that it is permissible to conduct an open air search around a vehicle while a traffic stop is still in progress so long as the stop has not been unreasonably prolonged for the purpose of conducting the search."[10] Based on the evidence that the dog sniff occurred during the ordinary course of the traffic stop and did not unreasonably prolong the process of the traffic stop, the trial court did not err by finding it permissible. And in light of the behavior of the trained narcotics dog during his free-air sniff, the officers' search of the RV was authorized.[11]

2. Lewis also argues that the trial court clearly erred by relying on allegedly false testimony by Jackson during the suppression hearing when the video recording of the traffic stop was proffered for admission by the State. Lewis points out that the officer initially testified that he had last seen the video, which is one hour and forty-

---

[9] (Punctuation omitted.) Id. at ___. See also *St. Fleur v. State*, 296 Ga. App. 849, 851-852 (1) (676 SE2d 243) (2009) ("[A] law enforcement officer conducting a routine traffic stop may request and examine a driver's license and check for outstanding warrants[;] and questioning the driver or engaging in small talk while verifying the items mentioned above is not a seizure unless the detention is prolonged by the questioning.") (punctuation and footnote omitted).

[10] (Punctuation omitted.) *St. Fleur*, 296 Ga. App. at 852 (1).

[11] See id. at 853 (2), citing *Davidson v. State*, 257 Ga. App. 260, 264 (1) (570 SE2d 698) (2002) .

8

four minutes in total length, earlier that morning at "nine forty-five, ten o'clock." Based on the officer's appearance in court, Lewis argues that it was physically impossible for the officer to have seen the entire video that morning at that time. Therefore, he argues, the officer's testimony was false, and the trial court clearly erred by relying on it elsewhere when the officer described the traffic stop.[12]

Nevertheless, this argument ignores the fact that the material portion of the video – from the time the officer observed Lewis swerving to the time Lewis was arrested – is less than 19 minutes long. Therefore, the officer could have truthfully answered that he last saw the portion of video relevant to the suppression hearing that morning, and when given the opportunity, he clarified his testimony that he had not watched the entire video that morning. In light of this record, there was no clear error by the trial court in relying on the officer's later description of the traffic stop, and the trial court's findings are consistent with the video of the traffic stop, which we review de novo.[13] Accordingly, this enumeration is without merit.

---

[12] The transcript shows that after Lewis objected to the officer's ability to authenticate the video, the trial court recessed the proceedings for lunch and allowed the officer time to view the entire video, and the officer did so.

[13] See *State v. Mohammed*, 304 Ga. App. 230, 231-232 (695 SE2d 721) (2010) (facts plainly discernible from a video are reviewed de novo)

*Judgment affirmed. Phipps, C. J., and Boggs, J., concur.*