**THIRD DIVISION**
**MILLER, P. J.,**
**DOYLE, P. J., and GOBEIL, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**July 24, 2023**

# In the Court of Appeals of Georgia

A23A0637. RUSH v. THE STATE.

GOBEIL, Judge.

Following a bench trial, the trial court found Bobby Dail Rush guilty of trafficking in methamphetamine, possession of a Schedule II controlled substance (oxycodone), possession of a firearm during the commission of a felony, and possession of drug-related objects. Rush appeals directly from his judgment of conviction, arguing that the trial court erred in denying his motion to suppress because: (1) the deputy lacked sufficient probable cause or reasonable articulable suspicion to initiate the traffic stop; (2) the responding deputies unlawfully protracted the traffic stop by abandoning "the mission" of the stop (predicated on a traffic infraction) to pursue a drug investigation without valid justification; and (3) the deputies improperly undertook an investigation unrelated to the purported traffic

infraction in an attempt to justify the stop and the subsequent illegal search of Rush's person and vehicle absent a warrant. For the reasons that follow, we affirm.

We apply the following principles upon appellate review of a ruling on a motion to suppress:

> First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support them. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment. These principles apply equally whether the trial court ruled in favor of the State or the defendant.

*Brown v. State*, 293 Ga. 787, 803 (3) (b) (2) (750 SE2d 148) (2013) (citation and punctuation omitted). So viewed, the record shows that on May 27, 2020, Mark Sutton, a narcotics investigator with the Lumpkin County Sheriff's Office, received a tip from a confidential informant about the details of a vehicle in Dahlonega involved in drug activity. Investigator Sutton observed the vehicle in the area and followed it to a gas station. Sutton later identified the driver as Rush. Sutton then contacted Corporal Corey Morgan with the Lumpkin County Sheriff's Office K-9 unit

2

to initiate a traffic stop of Rush's vehicle based on his suspicion that the vehicle was involved in transporting narcotics. Sutton gave Morgan a description of Rush's vehicle and the direction of travel. Sutton believed that one of the headlights on Rush's vehicle was damaged, but he advised Morgan "to get his own independent probable cause" for the stop.

At approximately 1:30 p.m., Corporal Morgan caught up with Rush's vehicle and observed that it was being driven in the rain without illuminated headlights. Morgan activated his blue lights to initiate a traffic stop. Rush's vehicle did not stop right away, and Morgan had to turn on his siren before the vehicle finally pulled over. Morgan observed the driver moving around near the center console before the vehicle came to a stop, and the driver continued to move around in the vehicle even after coming to a stop. Morgan described that such movements are potential signs of a safety risk as the driver might be trying to access or hide a weapon or other contraband. Investigator Sutton had informed Morgan about the vehicle's possible involvement in narcotics and, based on his training and experience, Morgan was aware that persons in the drug trade often carry firearms.

After making contact with Rush, who was alone in the vehicle, Corporal Morgan informed Rush that the reason for the traffic stop was due to a broken

headlight. Morgan directed Rush to put his hands on the steering wheel as a safety precaution due to Rush's movement in the vehicle prior to coming to a stop. Morgan then asked Rush to exit the vehicle and conducted a pat down search to ensure that Rush did not have any weapons on his person. Morgan felt a bulge in Rush's front pants pocket, which Rush claimed was money. Upon manipulating the bulge, Morgan believed it to be methamphetamine shards because "nothing else looks or feels like methamphetamine."

Sergeant Jacob Smith of the Lumpkin County Sheriff's Office arrived on the scene to assist with the stop. Morgan asked Smith to run a check on Rush's license. While awaiting the results from dispatch, Smith initiated contact with Rush and became concerned that Rush might be under the influence of either alcohol or narcotics due to Rush's eyes being constricted, his speech pattern, and "his jerking." Approximately five minutes into the traffic stop, while Smith conducted a check of Rush's license, Morgan took his K-9 around the exterior of Rush's vehicle for a free-air sniff, and the dog returned a positive alert to the seam of the driver's door. At that point, Smith was still waiting on dispatch to confirm the validity of Rush's license. Morgan informed Rush about the positive dog alert and gave Rush the opportunity to tell him what was inside the vehicle. Rush admitted that he had a pipe and some

4

methamphetamine in the center console of the car, and also added that he had methamphetamine in his pocket. After Morgan placed Rush under arrest, he recovered a bag of methamphetamine from Rush's pocket. Police also found a smaller amount of methamphetamine, a smoking device, and a pink tablet in the center console, as well as a loaded pistol and two sets of digital scales inside a safe in the trunk of the car. Rush admitted that the pill was oxycodone.

Based on the foregoing, a grand jury indicted Rush for trafficking methamphetamine, possession of a Schedule II controlled substance (oxycodone), possession of a firearm during the commission of a felony, and possession of drug-related objects (digital scales).

Rush filed a motion to suppress, arguing that "[a]fter illegally stopping, waylaying and detaining [Rush]," law enforcement illegally searched Rush and his vehicle absent "a warrant, probable cause, reasonable articulable suspicion, or valid consent." Rush maintained that even if the initial traffic stop was deemed valid, law enforcement unlawfully prolonged the stop, and thus, any evidence or statements gathered during the ensuing illegal search and seizure of Rush and his vehicle should be suppressed.

At the suppression hearing, the State played footage from Corporal Morgan's and Sergeant Smith's body cams, which depicted the events of the traffic stop and Rush's subsequent arrest as described above. The trial court denied the motion, finding in relevant part that the traffic stop of Rush's vehicle was supported by both reasonable articulable suspicion and probable cause, as Corporal Morgan observed Rush operating a vehicle in the rain without headlights; Morgan observed Rush "conducting movement within the vehicle" and fail to immediately heed instructions to stop the vehicle; a brief pat down of Rush caused Morgan to suspect that Rush was in possession of a bag of methamphetamine; within five minutes of the stop, a narcotics K-9 gave a positive alert on the seam of the driver's side door, which provided probable cause to search the vehicle; Rush subsequently admitted to the existence of narcotics in the vehicle; and a search incident to Rush's arrest yielded the discovery of a large amount of methamphetamine in Rush's pocket. The court concluded that based upon a totality of the circumstances, "the evidence [Rush sought] to have suppressed was lawfully seized."

At the stipulated bench trial,[1] the State tendered a laboratory report which showed that the total weight of the methamphetamine seized from Rush's person and vehicle was 111.176 grams. The trial court found Rush guilty on all counts. The court sentenced Rush to a total term of 35 years with the first 20 years to be served in confinement and the remainder on probation. The instant appeal followed.

1. Rush argues that Corporal Morgan lacked sufficient probable cause or reasonable articulable suspicion to initiate the traffic stop of Rush's vehicle. He asserts that Morgan's only justification for pulling Rush over was an alleged headlight violation stemming from either a defective headlight or Rush's failure to turn his headlights on while driving in the rain. He maintains that the record evidence fails to indicate the precise weather conditions at the time of the stop. According to Rush, "the precise nature of the 'deficiency' observed by [Corporal] Morgan regarding [Rush's] headlight is inconsistent, unclear, and frequently factually incompatible with itself," and therefore, the State lacked a valid reason for the traffic stop.

---

[1] All of the evidence and testimony given at the motion to suppress hearing was adopted at the bench trial over Rush's objections as previously raised.

7

The legality of a traffic stop is measured by "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time. The validity of the stop, thus, depends on what the driver was doing and what that reasonably conveyed to the officer, not on what else the officer thought might be occurring." *Rosas v. State*, 276 Ga. App. 513, 515 (1) (a) (624 SE2d 142) (2005) (citation and punctuation omitted).

Here, Corporal Morgan testified at the suppression hearing that when he caught up with Rush's vehicle, he observed that the car was being driven in the rain without the headlights on. See OCGA § 40-8-20 (lights on vehicle required "at any time when it is raining in the driving zone"); *Richardson v. State*, 283 Ga. App. 89, 91 (640 SE2d 676) (2006) (traffic stop justified where evidence supported conclusion that dim lighting conditions required vehicle lights under OCGA § 40-8-20). Morgan then activated his blue lights to initiate a traffic stop. The trial court found that Morgan's testimony about the weather conditions was supported by the presence of multiple other vehicles operating with headlights illuminated, the use of windshield wipers, and wet road conditions, all of which were depicted in the body cam footage of the traffic stop, especially at the start of the stop. It follows that Rush has failed to meet his burden of proving that the trial court's factual findings were clearly erroneous or

that the court erred in denying the motion to suppress on the ground that the stop was unlawful. See *Soilberry v. State*, 282 Ga. App. 161, 162 (1) (637 SE2d 861) (2006) (deferring to the trial court's factual finding that the officer observed a traffic violation and affirming the denial of appellant's motion to suppress); *Turner v. State of Ga.*, 265 Ga. App. 40, 41-42 (2) (592 SE2d 864) (2004) (same). See also *Rosas*, 276 Ga. App. at 515 (1) (a) (sheriff was authorized to stop and detain defendants initially during a traffic stop because he saw their vehicle following the vehicle ahead of it too closely).

2. Rush next asserts that law enforcement unlawfully protracted the traffic stop by abandoning "the mission" of the stop (predicated on a traffic infraction) to conduct a drug investigation without valid justification.

The State bears the burden of proving that the search of the car was lawful, *Thomas v. State*, 301 Ga. App. 198, 198 (687 SE2d 203) (2009), and to carry this burden, the State must show that it was lawful to detain Rush until the time the drug dog indicated the presence of drugs.

> It is axiomatic that a police officer who observes a traffic violation is authorized to conduct a traffic stop of the vehicle in question. Once a valid traffic stop has been effected, the Fourth Amendment prohibits the officer from unreasonably prolonging the stop beyond the time required

9

to fulfill the purpose of the stop without a reasonable articulable suspicion of other illegal activity. But a reasonable time to conduct a traffic stop includes the time necessary for the officer to run a computer check on the validity of the driver's license and registration, and to check for outstanding warrants and/or criminal histories on the driver and other occupants. The law further allows the officer to question the vehicle's driver and/or its occupants during the course of the stop, and even to lawfully ask questions unrelated to the purpose of a valid traffic stop, so long as the questioning does not unreasonably prolong the detention.

*Young v. State*, 310 Ga. App. 270, 272-273 (712 SE2d 652) (2011) (citations, punctuation, and footnotes omitted).

In this case, after initiating the traffic stop, Corporal Morgan asked Rush to exit his vehicle to conduct a pat-down search to ensure that Rush did not have any weapons on his person. Morgan testified that he had safety concerns because he had observed Rush moving around the center console prior to the vehicle coming to a stop, indicating that the driver might be trying to access or conceal a weapon or other contraband. See *Rosas*, 276 Ga. App. at 518 (1) (c) ("out of concern for safety, an officer making a traffic stop may also order the driver and any passengers out of the vehicle") (footnote omitted). Rush also failed to immediately stop the vehicle upon Morgan's activating his lights, which required Morgan to turn on his siren. Morgan

10

observed a bulge in Rush's pocket that Rush claimed was money. During the pat-down, Morgan suspected that the bulge might be methamphetamine based on his training and experience.

While Sergeant Smith ran a check on Rush's license, Morgan initiated the free-air sniff with the drug dog. "[O]ur law is . . . clear that it is permissible to conduct an open air search around a vehicle while a traffic stop is still in progress so long as the stop has not been unreasonably prolonged for the purpose of conducting the search." *Wilson v. State*, 293 Ga. App. 136, 137 (666 SE2d 573) (2008); *State v. Simmons*, 283 Ga. App. 141, 143 (640 SE2d 709) (2006) ("(t)he use of a drug sniffing dog to conduct a free[-]air search around the exterior of a vehicle during the course of a lawful traffic stop does not implicate the Fourth Amendment under the United States Constitution") (citation and punctuation omitted). After the drug dog's positive alert on the driver side door of Rush's vehicle,[2] the police had probable cause to search the vehicle, which then yielded the discovery of the methamphetamine, smoking device, and oxycodone in the center console, as well as a loaded pistol and two sets of digital scales inside a safe in the trunk of the car. See *Davidson v. State*,

---

[2] See *McKinney v. State*, 326 Ga. App. 753, 756 (1) (755 SE2d 315) (2014) ("Whether [K-9] in fact alerted on the car was a question of fact for the trial court, which we must accept unless clearly erroneous.").

257 Ga. App. 260, 264 (1) (b) (570 SE2d 698) (2002) (drug dog's alert on front passenger door of defendant's vehicle provided police officer with probable cause to search glove compartment where officer retrieved bags containing cocaine).

In the instant case, as the free-air sniff occurred within five minutes of the initial stop with a K-9 who was already present on the scene and while the officers were still awaiting results from the check on Rush's license, Rush has failed to establish that the free-air sniff unreasonably prolonged the initial detention. Compare *Wilson*, 293 Ga. App. at 138 (holding that a three-minute delay between the completion of a traffic citation and the retrieval of a drug dog already on scene did not impermissibly extend the detention at a traffic stop); *Bowens v. State*, 276 Ga. App. 520, 521-522 (623 SE2d 677) (2005) (traffic stop was not prolonged by virtue of the dog's free-air search around the exterior of the vehicle as officer was still awaiting results of license and registration check when drug dog sniffed car); *Davidson*, 257 Ga. App. at 264 (1) (b) (finding that officer performing an exterior free-air sniff with a drug dog that was already present on the scene less than five minutes after the officer's initial encounter with the driver did not unreasonably prolong the detention), with *State v. Cunningham*, 246 Ga. App. 663, 664 (541 SE2d 453) (2000) (affirming trial court's grant of motion to suppress where officer

12

conceded at suppression hearing that he already had completed his investigation of the alleged traffic infractions during stop when he decided to retrieve K-9 from his police car to conduct a free-air sniff); *State v. Thompson*, 256 Ga. App. 188, 189-190 (569 SE2d 254) (2002) (excluding evidence obtained as a result of officer's continued questioning of defendant after citation had been written and license returned to defendant, resulting in a 20-minute delay while waiting for drug dog after traffic stop had concluded); *Gonzales v. State*, 255 Ga. App. 149, 150 (564 SE2d 552) (2002) (holding that officer went beyond permissible scope of investigation when he questioned defendants after traffic stop had ended but lacked reasonable suspicion to do so). Accordingly, this claim of error fails.

3. Finally, Rush alleges that the deputies improperly undertook a drug investigation unrelated to purported traffic infraction in an attempt to justify the traffic stop and the subsequent illegal search of Rush's person and vehicle absent a warrant.

The decision to stop an automobile is not unreasonable if the police have probable cause to believe that a traffic violation has occurred. *Delaware v. Prouse*, 440 U. S. 648, 661 (V) (99 SCt 1391, 59 LE2d 660) (1979). And it does not matter that the officer also believes the motorist has committed some other offense. *Whren*

13

*v. United States*, 517 U. S. 806, 813 (II) (A) (116 SCt 1769, 135 LE2d 89) (1996). The fact that a law enforcement officer may have some "ulterior motive" does not convert a constitutional stop supported by probable cause into a violation of the Fourth Amendment. See id. at 812-813 (II) (A), 819 (III) (pretextual stops supported by probable cause do not violate the Fourth Amendment). Even if the primary motive of the officers involved in Rush's stop was to discover illegal drugs in the vehicle, that motive did not prevent them from stopping Rush's vehicle if they had probable cause to believe that he had committed a traffic infraction. Id. Any suggestion that the pretextual nature of the stop somehow supports the finding of a Fourth Amendment violation has been soundly rejected by the Supreme Court. Id. at 812-813 (II) (A).

Here, Rush asserts that information from the confidential informant was insufficient to provide the police with reasonable suspicion that Rush had engaged in illegal drug activity sufficient to justify an investigatory stop. The State appears to concede this point. However, as previously discussed in Division 1, Corporal Morgan had probable cause to believe that Rush was in violation of the state law requiring motorists to utilize headlights while driving in the rain, OCGA § 40-8-20, and therefore, the stop was justified. Thereafter, as discussed in Division 2, because the free-air dog sniff (which yielded the discovery of drugs and other contraband in the

14

car) occurred during the ordinary course of the traffic stop and did not unreasonably prolong the stop, the trial court did not err by finding it permissible. Compare *Lewis v. State*, 332 Ga. App. 466, 470 (1) (773 SE2d 423) (2015) (open-air dog sniff of recreational vehicle and trailer it was towing did not unreasonably prolong traffic stop; dog sniff was conducted before completion of traffic stop and did not hinder officers' timely completion of the mission of traffic stop, as it was initiated by one officer while second officer finished filling out written warning and while officers waited for dispatch to return check on driver's license information), with *Weaver v. State*, 357 Ga. App. 488, 491 (851 SE2d 125) (2020) (officer unreasonably prolonged traffic stop of defendant's vehicle beyond the time reasonably required to complete his investigation of alleged traffic violation, even if defendant was nervous during the traffic stop; following stop of vehicle for a break light violation, officer continued to question defendant and passenger about multiple subjects unrelated to the purpose of the stop even after receiving an answer from dispatch regarding the legality of defendant's license and registration); *Nunnally v. State*, 310 Ga. App. 183, 187-189 (2) (713 SE2d 408) (2011) (police officer lacked reasonable, articulable suspicion of other criminal activity to justify prolonged detention of defendant following traffic stop for turn signal violation, despite officer's observation of defendant's fidgety

15

hand movements and failure to look officer in the eye, where defendant had been ordered out of car and a patdown of defendant revealed neither weapon nor contraband).

Based on the foregoing, we affirm the trial court's denial of Rush's motion to suppress evidence recovered from his person and vehicle during the traffic stop.

*Judgment affirmed. Miller, P. J., and Doyle, P. J., concur.*