## A97A1787. BARNES v. THE STATE.

(491 SE2d 116)

JOHNSON, Judge.

R. C. Barnes was convicted of possession of cocaine and obstruction of an officer. He appeals the denial of his motion to suppress evidence.

The transcript reflects that the trial judge asked for an order to be prepared to reflect his oral denial of Barnes' motion to suppress. However, we find no written order in the record. Nonetheless, a trial judge is not required to make findings of fact after a hearing on a motion to suppress. *Shirley v. State*, 166 Ga. App. 456, 458 (3) (304 SE2d 468) (1983). "When reviewing a trial court's decision on a motion to suppress, this court's responsibility is to ensure that there was a substantial basis for the decision. The evidence is construed most favorably to uphold the findings and judgment, and the trial court's findings on disputed facts and credibility are adopted unless they are clearly erroneous. Further, since the trial court sits as the trier of fact, its findings are analogous to a jury verdict and will not be disturbed if there is any evidence to support them." (Citation and punctuation omitted.) *Lambright v. State*, 226 Ga. App. 424, 425 (487 SE2d 59) (1997). Although we are without specific findings in this case, in reviewing the denial of a motion to suppress, this Court may consider both the transcript of the motion hearing and the trial transcript. *Beck v. State*, 216 Ga. App. 532, 536 (1) (455 SE2d 110) (1995).

The burden of proving a search was lawful is on the state. OCGA § 17-5-30 (b). A single witness, one of the police officers who participated in Barnes' arrest, testified at the motion to suppress hearing. The officer testified that he and another officer saw Barnes standing at an intersection in a "high stop and cop" area. When Barnes saw the police, he began walking away. The officers pulled their car over to Barnes and stopped, observing that he was "holding something in his hand with a rag."[1] Barnes turned away from them, and the officers asked Barnes to stop and talk with them. "He continued to act in a suspicious type manner. As we attempted to find out what was in his hand, Mr. Barnes started tussling with us. We then got this object from Mr. Barnes' hand, which it was a matchbox containing several pieces of [crack cocaine]." When asked several times what exactly Barnes did to warrant the stop, the officer stated he tried to walk away and "he was just acting suspicious." On cross-examination, the officer stated: "We didn't see Mr. Barnes committing any type of criminal activity. We saw him standing at the intersection; and when people stand at the intersection [in this area], we usually

---

[1] Later in his testimony, the officer admitted that he did not know whether there was anything inside the towel in Barnes' hand when they first approached him.

go up and we investigate do they live in that area, you know, what are they doing. So we didn't see Mr. Barnes doing anything, but we wanted to find out what [he] was doing." When asked directly what gave rise to an articulable suspicion that Barnes was about to commit a crime, the officer testified that Barnes was "in a cop-and-stop area, and we were going to investigate Mr. Barnes." Even the trial judge tried to focus the officer's testimony, asking him: "What did you think [Barnes] was doing?" The officer responded that when Barnes tried to walk away, he thought he was "up to some type of activity, possibly engaging in some type of a drug transaction, maybe later on a sale. That's my suspicion."

At trial the other police officer involved in Barnes' arrest testified as follows: "Traveling up 14th, we had turned off of Talbotton Road, were coming up 14th. I observed a black male standing right there at the corner of 26th and 14th. As soon as we come [sic] around the corner, that's normally what we do, is look several blocks ahead. And as I come [sic] up — we come [sic] around the corner, I was looking at this subject and there was [sic] approximately three to four police cars in a row. And we're well known as the jump-out boys in that area, the Tact Squad, and very hard on people who are involved with any type of drug activity. We came around the corner. I looked up. I saw this individual standing there. He looked up, and as soon as he saw us, or what I assumed made contact as far as eyes looking at us, he turned and started walking down 26th. As he was walking down 26th, we pulled up beside him. He looked over his shoulders several times. He appeared to me from my experience, looked like he was getting ready to run. At that point I asked him if he had seen a black male in a red jump suit run by here. At that time it stopped him and calmed him. He stated no. I got out of the vehicle. I said that just so I could get out and make sure I was out of the vehicle if he decided he wanted to start running. I stepped out. I asked him if he had seen a black male, he came through here. He said no. I got up on him. I said, you know, 'What is your business being in this area right now?' He stated — I can't remember exactly what his words were as far as what he was doing at that point or what he had told me. I asked him if he would, if he had any drugs or — correction, knives or guns on him. At that point he stated to me no. I asked him if he would place his hands on the car."

The United States Supreme Court has identified three levels of encounters between an individual and police. " 'The first involves the mere accosting by an officer usually requesting name and identification. There is no threshold requirement and indeed the individual may refuse to answer or ignore the request and go on his way if he chooses, for this does not amount to any type of restraint and is not encompassed by the Fourth Amendment. The second is the *"Terry*

type" (*Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968)) stop involving temporary restraint, a brief 'seizure' which must be supported by articulable suspicion. The third is an actual or de facto arrest which requires probable cause and involves restraint of one's liberty.' [Cit.]" *Lambright*, supra at 425 (1).

Applying this analysis, Barnes was free to walk away and refuse to answer or ignore the officers' request to speak unless the police had a particularized and objective basis for suspecting that he was involved in criminal activity. " 'This demand for specificity in the information upon which police action is predicated is the central teaching of (the Supreme Court's) Fourth Amendment jurisprudence.' [Cit.]" *Vansant v. State*, 264 Ga. 319, 320 (2) (443 SE2d 474) (1994). The police officer's testimony at the motion hearing that Barnes looked suspicious or acted suspiciously is a tautology and without more is insufficient to support any type of investigatory stop. Likewise the trial testimony, that Barnes "looked like he was getting ready to run," particularly when Barnes answered the officers' pretextual questions, is inadequate to justify this stop. And although a neighborhood's reputation has been regarded as a factor supporting articulable suspicion, the fact that Barnes was in a place which the officer characterized as a "stop and cop" area does not alone constitute an articulable suspicion justifying a *Terry* stop. See *State v. Banks*, 223 Ga. App. 838, 841 (479 SE2d 168) (1996) (physical precedent only), in which we held that mere presence in an area known to the police for drug activity, without more, is insufficient to support a reasonable suspicion that one is engaged in or about to engage in criminal activity. "An investigatory stop must be justified by some *objective* manifestation that the person stopped is, or is about to be, engaged in criminal activity." (Citation and punctuation omitted; emphasis in original.) Id. at 840. See *Lambright*, supra, where a suspicion of criminal activity justifying a stop became articulable when the officer saw a hand-to-hand exchange. See also *State v. Burnett*, 220 Ga. App. 133 (469 SE2d 324) (1996).

In this case the police were not able to articulate any cogent basis for detaining Barnes or conducting a pat-down search. Simply put, the state has not met its burden of establishing that the search was lawful. See *State v. Banks*, supra at 840-841. Even under the strict "clearly erroneous" standard of review, it is clear that the evidence in this case was obtained as a result of an illegal seizure. The trial court erred in denying Barnes' motion to suppress.

*Judgment reversed. Pope, P. J., and Blackburn, J., concur.*

Decided August 7, 1997.

*Hagler, Hyles, Adams & McKenna, Clark C. Adams, Jr.*, for appellant.

*J. Gray Conger, District Attorney, Frances D. Hakes, Assistant District Attorney*, for appellee.