**SECOND DIVISION
ANDREWS, P. J.,
MILLER and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**November 16, 2015**

# In the Court of Appeals of Georgia

A15A1498. REYES v. THE STATE.

BRANCH, Judge.

Following a trial by jury, Roger Alcantara Reyes was convicted on separate counts of possession of cocaine and possession of heroin. On appeal, he contends the evidence was insufficient to support the convictions and that the trial court erred by denying his motion to suppress evidence obtained during a traffic stop. We hold that the evidence presented at trial, including the proceeds of the vehicle search, was sufficient to sustain the convictions, but remand the case to the trial court for further consideration of the validity of the vehicle search executed after the valid traffic stop.

1. We turn first to the traffic stop. On review of a motion to suppress, we apply these principles:

> First, . . . [the trial judge's] findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support [them]. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.

*Miller v. State*, 288 Ga. 286-287 (1) (702 SE2d 888) (2010) (citations, punctuation and footnote omitted.) Fourth, we review questions of law de novo. *State v. Bethel*, 307 Ga. App. 508, 509 (705 SE2d 860) (2010). Finally, when reviewing a ruling on a motion to suppress, we may consider testimony submitted both at the hearing on the motion to suppress and at trial. See *Foster v. State*, 321 Ga. App. 118 (1) (741 SE2d 240) (2013); *White v. State*, 263 Ga. 94, 98 (5) (428 SE2d 789) (1993).

The evidence from both proceedings shows that on October 18, 2012, Georgia State Patrol Trooper Chris Carlisle was working in Gwinnett County in collaboration with the Immigration and Customs Enforcement arm of the Department of Homeland Security, conducting surveillance in connection with an investigation into money laundering. Carlisle testified that drug cartels in Mexico would arrange to transfer drug sales proceeds to people in the United States who would then launder the money into bank accounts. At about 3:30 p. m., Carlisle saw a dark blue Jeep Commander

2

with a certain license tag number drive into a business parking lot and, as he learned via radio from other officers, deliver a bag containing approximately $200,000 to a federal agent. Carlisle testified that based on the money transfer, "[w]e know this person is involved in some kind of illegal act." When the Jeep left the parking lot, Carlisle followed in his unmarked car, keeping the Jeep within sight as it traveled down I-85 southbound to I-75 southbound, even though the Jeep exited and then reentered the highway in what appeared to be a way to determine if anyone was following; the Jeep proceeded to Clayton County, where the it exited and stopped at a Chevron station. There, the Jeep pulled up to a gas pump but never got gas, then it changed location several times at the station before the driver and passenger got out and went into the neighboring restaurant to eat. Over the course of about 45 minutes to an hour, the men went in and out of the restaurant more than once and were often seen talking on their cell phones. They also spent several minutes looking at the undercarriage of the Jeep from the front to the back of the vehicle, which, according to Carlisle, could show that the men were looking to see if a GPS tracking device had been attached to the Jeep.

A red Ford Explorer with a drive-out license tag then pulled into the Chevron, circled around, and parked next to the Jeep. The driver of the Ford got out and

exchanged a few words with the men in the Jeep; two large, wheeled suitcases then were transferred from the Ford to the Jeep, but there is no evidence as to who moved the suitcases. The same two men who had driven the Jeep from Gwinnett County got back into the Jeep and drove out of the Chevron station; the Ford left drove off in a different direction. Carlisle and other officers followed the Jeep, but, concerned that the suitcases were filled with drugs or money, Carlisle called for a marked car to pull over the Jeep for any traffic violation. Soon the Jeep drove outside of its lane and turned without signaling and was pulled over by Officer Mitnaul in a marked car; Carlisle then arrived on the scene. A video recording of the traffic stop was introduced into evidence and shown at the hearing on the motion to suppress.

Carlisle testified that after Reyes, who had been driving the Jeep, got out of the vehicle, he was very nervous and shaky, had a dry mouth, and avoided eye contact. The passenger, Silvestre Lopez Oloarte, spoke very little English and it was difficult to confirm his identity; he had a Mexican identification card. Reyes said that he had been driving the Jeep, which was registered in North Carolina, for about 15 days; he said that the car belonged to a friend of Oloarte, but he personally did not know who the owner was. He claimed he had known Oloarte for several years, but he gave a name different than the one on Oloarte's identification card. When asked where he

4

had come from in the Jeep, Reyes gave an answer inconsistent with what Carlisle had personally observed. Reyes said that he drove from Doraville to Clayton County to get gas, yet the prices were not better in Clayton County and Reyes, in fact, did not get any gas. Carlisle could see the two suitcases in the back seat of the Jeep, and he asked Reyes if he was going to the airport. Reyes replied, "no" and that he did not know what suitcases Carlisle was talking about. Oloarte said that a friend gave them the suitcases and told them to drive them somewhere but that he did not know how to contact the friend.

The traffic stop had lasted almost 24 minutes when Mitnaul issued Reyes a warning citation, returned Reyes's licence to him, and gave Reyes a form for consent to search the Jeep. In a conversation that lasted several more minutes, Reyes asked questions about the consent form, expressed reservations because the Jeep did not belong to him, and ultimately refused to consent to a search of the Jeep. After Reyes refused, Carlisle requested the K-9 officer who had arrived sometime earlier to perform a dog sniff of the vehicle. The dog alerted, the vehicle was searched, and in the suitcases the officers found 22 wrapped and taped bricks of what proved to be heroin weighing approximately 22,000 grams and 7 bricks of cocaine weighing 7,709 grams.

5

Both Reyes and Oloarte were charged with possession of and trafficking in cocaine and heroin, and Reyes was charged with failure to signal while turning. Reyes was tried separately and convicted on both counts of possession but acquitted of trafficking.

In its order denying Reyes's motion to suppress, the trial court found that Reyes was legally stopped because he failed to signal before turning and failed to maintain his lane while driving. The court also found that, analyzing the totality of the circumstances, the officers did not unreasonably extend the stop of the car or its occupants. In so doing, the trial court stated that it "does not find that the use of the canine *contemporaneously* with the traffic stop to conduct an open air search of the vehicle was in violation of the Defendant's rights." (Emphasis supplied). The court also found as a matter of fact that Reyes and Oloarte gave conflicting stories, that Reyes indicated that he was driving a friend's car but declined to name the friend, and that Reyes was nervous and shaking during the encounter.

1. Reyes does not contest the validity of the initial traffic stop. Rather, he contends that the officers detained him after the traffic stop was completed in order to perform the dog sniff and that the officers did not have reasonable suspicion of criminal activity to do so.

6

The United States Supreme Court recently has reiterated that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, _ U. S. _ (135 SCt 1609, 191 LE2d 492) (2015). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." Id. at __ (II) (citations omitted.) An officer may not conduct unrelated investigations during an otherwise lawful traffic stop "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at __ (II). Thus, because "a dog sniff is not fairly characterized as part of the officer's traffic mission," a dog sniff that prolongs the traffic stop must be justified by reasonable suspicion of other criminal activity. Id. at __ (1).

Here, as the video shows and the State concedes, the dog sniff was performed after the completion of the traffic-violation stop was concluded and after several more minutes of attempting to get Reyes to consent to a search of the Jeep. The dog sniff clearly prolonged the traffic-violation portion of the stop and therefore, the trial court's conclusion that the dog sniff occurred during the traffic stop was incorrect.

7

The trial court relied on that finding and did not analyze whether the officers had reasonable suspicion of other criminal activity to justify either the initial stop or Reyes's continued detention for the dog sniff.

Whether a traffic stop was reasonable under the Fourth Amendment does not depend upon the subjective motives, beliefs, or intentions of the individual officers involved. See *Whren v. United States*, 517 U. S. 806, 813 (II) (A) (116 SCt 1769, 135 LE2d 89) (1996) ("[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," and "the constitutional reasonableness of traffic stops [does not] depend[ ] on the actual motivations of the individual officers involved"); *Maryland v. Macon*, 472 U. S. 463, 470-471 (II) (A) (105 SCt 2778, 86 LE2d 370) (1985) ( "[w]hether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken") (citation and punctuation omitted); *Rodriguez v. State*, 295 Ga. 362, 371 (2) (b), n. 13 (761 SE2d 19) (2014) (same). Thus, a stop may be justified based on reasonable suspicion of a separate violation of law from the basis given by the officer for the stop. See, e.g., *Maxwell v. State*, 249 Ga. App. 747, 748 (549 SE2d 534) (2001) (officer who stopped vehicle based on probable cause of a traffic

8

violation also had reasonable suspicion of a separate violation of law); *United States v. Cardona Rivera*, 904 F2d 1149, 1153 (7th Cir. 1990) (where officers' claim that they stopped defendant for traffic violations was "not worthy of belief" but where officers had other "objectively reasonable grounds for doing so," the stop was legal). Cf. *Devenpeck v. Alford*, 543 U. S. 146, 153 (II) (125 SCt 588, 160 LE2d 537) (2004) (an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause").

Here, in addition to probable cause for failure to signal and maintain lane while driving, the officers may have had reasonable suspicion prior to stopping the Jeep of other illegal activity arising out of the collective knowledge of the officers who were in communication with each other both during the money laundering investigation and the subsequent events at the Chevron station. See *Burgeson v. State*, 267 Ga. 102, 105 (3) (a), 475 S.E.2d 580 (1996) (setting forth the collective knowledge rule).

The State bears the burden of proving facts that establish a basis for continued detention. *McSwain v. State*, 240 Ga. App. 60, 61 (522 SE2d 553) (1999). Although whether the State has met this burden is a question of law, *Rosas v. State*, 276 Ga. App. 513, 516 (1) (b) (624 SE2d 142) (2005), we are unable to address the question on appeal because the trial court did not make any findings related to Reyes's

9

involvement in the earlier transfer of money to an undercover agent which, if credible, is relevant to a determination of whether the officers had reasonable suspicion, both before the traffic stop and thereafter, that Reyes was involved in other criminal activity, such as money laundering or drug trafficking. And "an appellate court generally must limit its consideration of the disputed facts to those expressly found by the trial court." *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015) (footnote omitted). "If the trial court has made express findings of fact, but not with sufficient detail to permit meaningful appellate review, an appellate court may remand for further findings." Id., n. 6 (citations omitted).

Because the trial court erred by finding that the dog sniff occurred contemporaneously with the traffic stop and because the trial court did not make findings regarding Reyes' possible involvement in events discovered during the money laundering investigation, we vacate both the trial court's order denying Davis's motion to suppress and the judgment of conviction and remand the case for further proceedings consistent with this opinion. See *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) (vacating and remanding decision on motion to suppress for trial court to further consider issues); see also *Rodriguez*, _ U. S. at __.

10

2. Reyes also challenges the sufficiency of the evidence on both counts of possession of a controlled substance. When the appellate courts review the sufficiency of the evidence, they do not "re-weigh the evidence" or resolve conflicts in the testimony; instead they defer "to the jury's assessment of the weight and credibility of the evidence." *Greeson v. State*, 287 Ga. 764, 765 (700 SE2d 344) (2010). See also *Glaze v. State*, 317 Ga. App. 679, 680-681 (1) (732 SE2d 771) (2012). Appellate courts determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (citation and emphasis omitted).

Reyes was found to be driving a Jeep, the same vehicle he had been driving for two or three weeks, that contained suitcases that contained large quantities of heroin and cocaine. When driving from Gwinnett to Clayton County, he made a maneuver that appeared to an officer to be an attempt to ensure that no one was following the Jeep. At the Chevron, he and Oloarte searched the undercarriage of the Jeep in a way that appeared to an officer to be an attempt to ensure that a GPS device had not been attached to the Jeep. He and his passenger waited for almost an hour at the Chevron

11

without buying gas before a Ford Explorer arrived, and they were present when the two large suitcases were transferred from the Ford to the back seat area of the Jeep. The suitcases were in plain view in the back seat of the Jeep at the time of the traffic stop, yet when confronted about them, Reyes denied knowing what suitcases Carlisle was talking about. Reyes testified in his own defense that he was a only a driver for Oloarte, that he followed Oloarte's instructions on where to drive and where to park, that he never had contact with the people in the Ford Explorer, and that he did not move the suitcases from the Ford to the Jeep.

> [T]he law recognizes that possession can be actual or constructive, sole or joint . . . . A person has actual possession of a thing if he knowingly has direct physical control of it at a given time. A person who, though not in actual possession, knowingly has both the power and intention at a given time to exercise dominion or control over a thing is then in constructive possession of it. If one person alone has actual or constructive possession of a thing, possession is sole, but if two or more persons share actual or constructive possession of a thing, possession is joint.

*Holiman v. State*, 313 Ga. App. 76, 78 (1) (720 SE2d 363) (2011) overruled in part, on other grounds, *Maddox v. State*, 322 Ga. App. 811, 815 (2) (746 SE2d 280) (2013) (citations and punctuation omitted). The trial court instructed the jury on this law. "A

12

finding of constructive possession of contraband cannot rest upon mere spatial proximity to the contraband," *Mitchell v. State*, 268 Ga. 592, 593 (492 SE2d 204) (1997), and the defendant's mere presence at the scene of the crime is an insufficient basis to convict. *Whipple v. State*, 207 Ga. App. 131, 132 (1) (427 SE2d 101) (1993). Here, the jury had sufficient evidence to conclude that Reyes was a party to the crime of possession of the contraband. He drove and inspected the vehicle in a way that suggested he was worried about being followed; he was present when the two suitcases were transferred to the Jeep; and the suitcases were in plain view in the vehicle as he drove away from the Chevron. Thus, the State's evidence showed more than Reyes' mere presence in the Jeep or spacial proximity to the contraband; it raised a reasonable inference that Reyes had the intent to exercise control over the contraband.

Reyes argues that because Oloarte had equal access to the suitcases, the evidence was insufficient to support his conviction of possession of the contraband. But as this Court has recently clarified,

> Circumstantial evidence that multiple occupants of a car had equal access to hidden contraband may support the theory that all the occupants were guilty as parties to the crime and had joint constructive possession of the contraband. Under these circumstances, the State may

13

elect to prosecute the occupants jointly or separately or may elect to prosecute only one of the occupants for directly committing the crime, but nevertheless prove the sole prosecuted occupant was guilty as a party to the crime.

*Maddox*, 322 Ga. App. at 811 (citations and punctuation omitted).

*Judgment vacated and case remanded with direction. Andrews, P. J., and Miller, J., concur.*