**SECOND DIVISION
ANDREWS, P. J.,
MILLER and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**November 3, 2015**

# In the Court of Appeals of Georgia

A15A1064. BLANKS v. THE STATE.

BRANCH, Judge.

After a dispatcher informed an officer that a black Chevrolet Sonoma pickup truck had been seen speeding southbound on Peachtree Parkway but failed to relate other details from the 911 call, the officer performed a traffic stop without personally witnessing any traffic violations; the traffic stop ultimately led to Christopher Blanks's arrest for driving under the influence. Following a bench trial based on stipulated evidence, Blanks was convicted of driving under the influence. On appeal, he contends the trial court erred by denying his motion to suppress evidence obtained during his traffic stop. We affirm.

On review of a ruling on a motion to suppress, the trial judge's findings of fact should not be disturbed if there is any evidence to support them; determinations of

fact and credibility must be accepted unless clearly erroneous; and the evidence must be construed in favor of the trial court's findings and judgment. *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994); *Jackson v. State*, 258 Ga. App. 806, 807-808 (2) (575 SE2d 713) (2002). "In all cases, [appellate courts] independently apply the law to the facts." *Drake v. State*, 296 Ga. 286, 288 (2) (766 SE2d 447) (2014) (citation omitted).

In its order denying Blanks's motion to suppress, the trial court found as a matter of fact that an anonymous person called 911 to report that he had observed a black GMC Sonoma truck driving southbound on Peachtree Parkway in Peachtree City in an erratic fashion, including accelerating up to speeds of 60 miles per hour and slowing down and weaving from side to side on the roadway. The tape recording of the 911 call supports these findings. The recording shows that the caller was on the call for almost five minutes. During that time, the caller reported that he was following a black Chevrolet Sonoma pickup truck on Peachtree Parkway that could not stay within the lines, was "all over the road," and at one point was traveling 60 mph in a 40 mph zone. The caller reported the events as they were happening, including identifying the cross streets and a middle school that the truck was passing, thereby indicating the truck's location and direction of travel. At several intervals, the

2

911 operator confirmed with the caller that the caller still had the truck in sight. The caller reported that the truck appeared to have a male driver and a female passenger. About 4:00 minutes into the call, the caller reported that the truck was approaching a cross street called "Crosstown" and that he saw an officer making a u-turn. The caller then had to turn and reported that the truck was proceeding through the intersection and continuing on Peachtree Parkway.

The trial court found that the dispatcher issued an alert, received by Officer DiGrazia of the Peachtree City Police Department, that a black Sonoma was being operated southbound and was speeding, and that DiGrazia saw a truck fitting the description and conducted a traffic stop. Officer DiGrazia's testimony and her video recording of the traffic stop support this finding. DiGrazia testified that at 2:57 a.m. when there was very little traffic, she received the dispatcher's call to lookout for a southbound black Sonoma that was traveling southbound on Peachtree Parkway coming in her direction and that the truck was speeding. DiGrazia was located a short distance south from the intersection between Peachtree Parkway and Crosstown facing southbound on Peachtree Parkway. Within minutes, DiGrazia subsequently saw a black Sonoma being driven by Blanks, she followed briefly to verify the type

3

of truck, then activated her blue lights and conducted a traffic stop in an apartment complex parking lot into which Blanks had turned.

It is not disputed that when DiGrazia spoke to Blanks, she could smell an odor of alcohol coming from his person. When she asked Blanks if he had anything to drink, Blanks responded, "No." Blanks agreed to perform field sobriety tests and to provide a roadside sample of his breath which tested positive for alcohol. Based on the results of both tests, DiGrazia arrested Blanks for driving under the influence to the degree that he was less safe.

The trial court held that, based on the information known to DiGrazia, DiGrazia had reasonable articulable suspicion to stop Blanks for the offense of speeding and that she was not required to question the dispatcher about the source of the information or wait until she observed criminal activity. The court concluded that the traffic stop was proper and that the officer had probable cause to arrest Blanks; thus, the court denied the motion to suppress.

The parties later agreed to submit the transcript of the hearing on the motion to suppress as the evidence against Blanks, together with a stipulation that Blanks was eventually tested and determined to have a blood alcohol level between .137 and .140. Blanks was convicted of driving under the influence, less safe.

1. Although Blanks contends the trial court erred by denying his motion to suppress on the ground that the officer lacked articulable suspicion to stop him, he does not challenge the court's findings of fact in the order on the motion to suppress, and, as shown above, they are supported by the record. Rather, Blanks asserts that because the dispatcher relayed only part of the information obtained from the 911 caller to DiGrazia—that is, that a black Sonoma was being operated southbound and was speeding —the information known to DiGrazia provided an insufficient basis for her to perform a traffic stop. He notes that DiGrazia did not have the license tag number of the vehicle, a description of the driver, or any indication of wrongdoing other than speeding.

"The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, _ U. S. _ (II) (134 SCt 1683, 188 LE2d 680) (2014), quoting *United States v. Cortez*, 449 U. S. 411, 417-418 (II) (A) (101 SCt 690, 66 LE2d 621) (1981). The officer's knowledge is based on the totality of the circumstances:

> The "reasonable suspicion" necessary to justify such a stop is dependent upon both the content of information possessed by police and its degree

5

of reliability. The standard takes into account the totality of the circumstances—the whole picture. Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.

*Naverette*, _ U. S. at _ (II) (citation and punctuation omitted).

(a) We first agree with the State that the question whether DiGrazia had articulable suspicion to perform the stop should be resolved based on all the information known to both DiGrazia and the dispatcher. "Probable cause [and articulable suspicion] may rest upon the collective knowledge of the police when there is some degree of communication between them, rather than solely on the information possessed by the officer who actually makes the arrest." *Goodman v. State*, 255 Ga. 226, 229 (13) (336 SE2d 757) (1985) (citation omitted); *State v. Maddox*, 252 Ga. App. 414, 416 (556 SE2d 501) (2001) ("Police officers are authorized to use information received by radio dispatch as part of their basis for articulable suspicion to conduct a stop.") (footnote omitted); *Buffington v. State*, 228 Ga. App. 810, 811 (492 SE2d 762) (1997). Thus, we are authorized to consider the additional details regarding Blanks's driving that the caller provided during the 911 call but that were not related to DiGrazia.

6

(b) Next, despite the fact that the information was provided by an anonymous caller, the totality of the circumstances provided sufficient articulable suspicion for DiGrazio to stop Blanks. The use of anonymous tips as part of the basis for reasonable suspicion depends on whether there are sufficient indicia of reliability to those tips:

> Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.

*Florida v. J. L.*, 529 U. S. 266, 270 (II) (120 SCt 1375, 146 LEd2d 254) (2000) (citation and punctuation omitted).

In *Navarette*, a dispatcher broadcast that a 911 caller had reported that a southbound silver Ford 150 with a certain license tag number had run the caller off the roadway and was last seen about five minutes earlier. *Navarette*, __ U. S. at __. An officer responded to the broadcast and pulled the truck over, a second officer arrived on the scene, and both officers smelled marijuana as they approached the

7

truck. Id. The officers saw 30 pounds of marijuana in the truck bed and therefore arrested the driver and passenger. Id.

In addressing the denial of the defendants' motion to suppress the evidence, the Supreme Court analyzed whether the 911 call had sufficient indicia of reliability to support the traffic stop. The Supreme Court first found that the fact that the tipster reported that she had been run off the road by a specific vehicle showed that she "claimed eyewitness knowledge of the alleged dangerous driving," which supports the tip's reliability and implies that the car was being driven dangerously. *Navarette*, __ U. S. at __ (II) (B).The court also found that the caller's nearly contemporaneous call following the incident suggested reliability, id. at __ (II) (B), and that the caller's use of the 911 emergency system indicated veracity because 911 calls are recorded, phone numbers are captured, and the caller's location can often be determined, significantly reducing anonymity. Thus, the court concluded, there were some indicia of reliability surrounding the anonymous tip. Id.

The court also explained that "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" *Navarette*, _ U. S. at _ (II) (C) quoting *Terry v. Ohio*, 392 U. S. 1, 30 (V) (88 SCt 1868, 20 LE2d 889) (1968). The court noted that "[t]he 911 caller in this case

8

reported more than a minor traffic infraction and more than a conclusory allegation of drunk or reckless driving. Instead, she alleged a specific and dangerous result of the driver's conduct: running another car off the highway." Id. The court concluded that the 911 caller's report of being run off the roadway, "viewed from the standpoint of an objectively reasonable police officer, amounts to reasonable suspicion of drunk driving." Id. (citation and punctuation omitted). The court noted, however, that "[u]nconfirmed reports of driving without a seatbelt or slightly over the speed limit, . . . are so tenuously connected to drunk driving that a stop on those grounds alone would be constitutionally suspect." Id.

Here, the 911 call contained several similar indicia of reliability. First, the caller was reporting the information live while mostly keeping the black Sonoma in sight. Thus, his report was that of an eye witness and was made contemporaneously with the events that he was observing. The caller also provided live updates on the vehicle's location and provided additional detail, when asked by the dispatcher, about how the vehicle was being operated during the time that the caller was on the phone. And for the same reasons explained in *Navarette*, the caller's hope to remain anonymous when making a 911 call has been undermined by modern technology and regulation. We conclude that the 911 call in this case contained sufficient indicia of

9

reliability to allow consideration of the information contained in the call when determining whether DiGrazia had articulable suspicion to stop the vehicle.

Next, as in *Navarette*, the 911 call raised a reasonable inference that the vehicle was being operated by someone under the influence of drugs or alcohol. At 3:00 a.m., the driver was swerving "all over the road," could not "keep it between the lines," and at one point was traveling approximately 60 miles per hour in a 40 mile per hour zone. The caller's information, therefore, provided a reasonable officer with sufficient information that "a crime was afoot," namely, that a person on the road at 3:00 a.m. was incapable of operating their vehicle properly, thus raising a reasonable inference of drunk driving. *Navarette*, _ U. S. at _ (II) (C).

(c) Finally, to the extent that Blanks contends that DiGrazia did not have enough descriptive information to stop the correct automobile, the trial court's implicit finding that DiGrazia stopped the truck that was the subject of the 911 call is supported by the record and not clearly erroneous. The 911 caller gave the make, model, and color of the vehicle, he followed the truck for almost five minutes on Peachtree Parkway all the way to the intersection with Crosstown; DiGrazia was parked just south of Crosstown on Peachtree Parkway; only minutes after hearing the initial dispatch to be on the lookout for the black Chevrolet Sonoma, DiGrazia saw

10

a truck fitting that description, traveling in the direction given by the caller; and it was 3:00 a.m. and there were very few other vehicles on the road.

In sum, the trial court did not err by concluding that DiGrazia had articulable suspicion to perform the traffic stop. See *State v. Durr*, 274 Ga. App. 438, 439 (1) (618 SE2d 117) (2005) (even "weaving within a lane may be justification for a traffic stop because it could indicate that the driver is under the influence of alcohol") (citations omitted); *Veal v. State*, 273 Ga. App. 47, 49 (614 SE2d 143) (2005) (driving 30 mph below speed limit and weaving within a lane provided articulable suspicion of driving under the influence of alcohol).

2. Blanks also challenges the trial court's determination that following the roadside tests for driving under the influence, DiGrazia had probable cause to arrest.

> Sufficient probable cause to conduct a DUI arrest only requires that an officer have knowledge or reasonably trustworthy information that a suspect was actually in physical control of a moving vehicle, while under the influence of alcohol to a degree which renders him incapable of driving safely.

*Trotter v. State*, 256 Ga. App. 330, 331-332 (1) (568 SE2d 571) (2002) (footnotes omitted). "The test of probable cause requires merely a probability—less than a certainty but more than a mere suspicion or possibility." *Firsanov v. State*, 270 Ga.

11

873, 875 (3) (513 SE2d 184) (1999) (citation and punctuation omitted). And "[i]t is not necessary for the officer to actually see the suspect driving for there to be probable cause to make a DUI arrest." *Trotter*, 256 Ga. App. at 332 (footnote omitted).

Here, after the traffic stop, DiGrazia detected the odor of alcohol coming from Blanks's person, and one of the field sobriety tests (the Horizontal Gaze Nystagmus Test) and the portable breath test both indicated that Blanks was under the influence of alcohol. Also, as already explained, probable cause may rest on the collective knowledge of the investigating officers as long as there is some degree of communication between them. Thus, the facts that Blanks was swerving, unable to maintain his lane, and speeding may also be considered. We therefore conclude that the totality of the above circumstances provided DiGrazia with sufficient probable cause to arrest Blanks for driving under the influence of alcohol to the degree that he was less safe. See *Harkleroad v. State*, 317 Ga. App. 509, 512 (1) (c) (732 SE2d 278) (2012) (defendant's speeding, bloodshot eyes, odor of alcohol and failing the HGN test gave officer probable cause to arrest defendant for DUI); see also *Cann-Hanson v. State*, 223 Ga. App. 690, 691 (1) (478 SE2d 460) (1996) ("the results of the field sobriety tests constitute[ ] admissible evidence of probable cause to support [an]

12

arrest"); compare *Bostic v. State*, 332 Ga. App. 604, 605 (774 SE2d 175) (2015) (driver's admission that he had consumed one beer, his watery eyes, and a positive alco-sensor test, together with the fact that no erratic driving was observed, without more, did not constitute probable cause to arrest for DUI).

*Judgment affirmed. Andrews, P. J., and Miller, J., concur.*