**THIRD DIVISION**
**DILLARD, P. J.,**
**GOBEIL and HODGES, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**August 23, 2019**

# In the Court of Appeals of Georgia

A19A1444. HALL v. THE STATE.

DILLARD, Presiding Judge.

Following a bench trial, the trial court found Randall Hall guilty of trafficking in methamphetamine. On appeal, Hall argues that the trial court erred in denying his motion to suppress evidence seized after a traffic stop and subsequent search of his vehicle. Specifically, he contends that the arresting officer unlawfully prolonged the traffic stop to allow for the arrival of a drug-detection canine. In addition, Hall maintains that the trial court erred in denying his claim that his counsel rendered ineffective assistance by failing to renew his objection to the unlawfully seized evidence during his bench trial. For the reasons set forth *infra*, we affirm.

When considering a trial court's ruling on a motion to suppress, an appellate court must "construe the evidentiary record in the light most favorable to the factual

findings and judgment of the trial court."[1] This, of course, means that the reviewing court

> generally must accept the trial court's findings as to disputed facts unless they are clearly erroneous, although the reviewing court may also consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape.[2]

That said, the trial court is not required to "make express findings of fact after a hearing on a motion to suppress."[3] In such a case, the reviewing court similarly construes the evidence "most favorably to uphold the trial court's judgment."[4] And regardless, we review *de novo* the trial court's "application of law to the undisputed facts."[5]

---

[1] *State v. Allen*, 298 Ga. 1, 2 (1) (a) (779 SE2d 248) (2015) (punctuation omitted); *accord Hughes v. State*, 296 Ga. 744, 746 (770 SE2d 636) (2015).

[2] *Allen*, 298 Ga. at 2 (1) (a) (punctuation omitted); *accord Hughes*, 296 Ga. at 746 & n.5.

[3] *State v. Brogan*, 340 Ga. App. 232, 234 (797 SE2d 149) (2017); *accord Barnes v. State*, 228 Ga. App. 44, 44 (491 SE2d 116) (1997).

[4] *Brogan*, 340 Ga. App. at 234; *accord Barnes*, 228 Ga. App. at 44.

[5] *Thompson v. State*, 348 Ga. App. 609, 612 (1) (824 SE2d 62) (2019) (punctuation omitted); *accord State v. Conner*, 322 Ga. App. 636, 637 (745 SE2d 837) (2013).

So viewed, the evidence shows that in May 2015, an agent with the Atlanta High Intensity Drug Trafficking Area ("HIDTA") Task Force was conducting surveillance on Elmer Moreno, a member of a drug trafficking organization, from which the agent recently seized over 200 pounds of methamphetamine. As a result of this surveillance, the agent learned that Moreno was frequently distributing methamphetamine from the parking lot of a Home Depot on Jimmy Carter Boulevard in Gwinnett County. Then, on May 8, 2015, the agent followed Moreno to the Home Depot and observed him having a conversation with a man standing next to a gray car with a temporary Tennessee license plate. After a few minutes, one of the other agents participating in the surveillance saw Moreno hand the man a bulky, white plastic bag, which the agents suspected contained illegal narcotics. Moreno and the other man then departed in their respective vehicles, and the agent began following the latter, intending to enlist the assistance of an officer in a marked patrol vehicle to conduct a traffic stop.[6] But no patrol officers were in the area at that time, and after following

---

[6] *See* OCGA § 40-8-91 (a) (requiring that any vehicle used to make arrests for traffic violations be "distinctly marked on each side and the back with the name of the agency responsible"). In addition to being undercover and, thus, in an unmarked vehicle, the agent also explained that he did not want to be personally involved in the traffic stop for fear that his involvement would alert Moreno's organization it was under surveillance.

the gray car south on Interstate 85 and then north on Interstate 75, the agent lost the vehicle in heavy traffic. Nevertheless, after running the vehicle's license tag number, the agent determined that the vehicle was registered to Randall Hall.

Not long thereafter, the HIDTA agent set up a remotely operated surveillance camera in the parking lot of that same Home Depot, which allowed him to monitor Moreno's meetings from a laptop computer. And on May 26, 2018, the agent observed Moreno's pickup truck pass him, apparently on the way to the Home Depot. Immediately, the agent contacted one of his partners, whom he asked to monitor the surveillance camera while he turned around to head back that way. Within a few minutes, the agent parked in a nearby lot and took over the surveillance. Upon doing so, he observed Moreno's vehicle pull up next to a gold Toyota pickup truck in the Home Depot parking lot. The driver of the gold pickup exited his vehicle, at which point the agent recognized him as Hall, the same man Moreno met with a few weeks earlier. Hall handed Moreno a yellow bag, and the two men then walked to the back of Moreno's pickup, where Moreno retrieved a bulky, white plastic bag from a toolbox and passed it to Hall, who then placed it in his own truck. The two men then spoke briefly before departing in their respective vehicles.

4

Believing Moreno and Hall had conducted yet another drug transaction and that Hall would pass by where the agent was currently parked on his way to Interstate 85, the agent waited for Hall's truck. A few minutes later, the agent saw Hall's truck and followed it to a Chick-fil-A parking lot, where it entered the drive-thru. And as the agent pulled into the restaurant's parking lot, he noticed two Georgia State Patrol vehicles parked there. The agent then parked his vehicle, went into the restaurant, and identified himself to the two state troopers. He explained to the troopers his belief that a driver currently waiting in the drive-thru was in possession of a significant amount of narcotics, identified Hall's pickup truck to the troopers, and asked if they would follow Hall and, if possible, conduct a traffic stop. The troopers agreed, and exited the restaurant just as Hall was leaving the drive-thru.

As Hall's vehicle pulled out of the parking lot, the troopers followed, and, shortly thereafter, they observed Hall's vehicle cross over the white line and change lanes without signaling. Consequently, one of the troopers activated his vehicle's blue lights to initiate a traffic stop. Hall—who was in the middle lane at the time—pulled over to the far left side of the road and stopped next to some road-side construction, leaving little room between his driver's side door and a ditch related to the construction. The trooper asked Hall to come back toward his vehicle, where there

was more room to stand. Hall complied, produced a Tennessee license, and the trooper explained why he had stopped him. Based on Hall's nervousness and the fact that he kept reaching into his pockets, the trooper asked Hall if he could pat him down for weapons. Hall consented, resulting in the trooper discovering that he was carrying over $1,000. The trooper then asked Hall what he was doing in the area, and Hall responded that he had just come from his girlfriend's apartment, which he claimed was behind the Home Depot. Finally, the trooper asked Hall if he could search his truck, but Hall refused to consent.

Subsequently, the trooper returned to his vehicle and began running Hall's license and registration through the Georgia Crime Information Center database. And while doing so, the trooper contacted dispatch to request assistance from a K-9 officer. A few minutes later, after he could not determine via GCIC if Hall's vehicle was insured, the trooper exited his vehicle and asked Hall if he had paper copies of his vehicle's registration and insurance. Hall responded that he would retrieve them from his glove box, and as the trooper followed Hall to the passenger side door of his truck, the trooper smelled the odor of burnt marijuana emanating from the vehicle. After Hall located the documents, the trooper took them and walked back toward his

6

vehicle to enter the information. At that point, a little over 15 minutes after the trooper initiated the traffic stop, the K-9 officer and his dog arrived on the scene.

Upon approaching Hall's truck, the K-9 officer also noticed the odor of marijuana. The trooper informed Hall that the K-9 officer was going to have his dog conduct an open-air sniff. And shortly thereafter, the K-9 officer's dog alerted to the presence of narcotics and did so a second time as he circled the vehicle. Then, after conferring with the K-9 officer, the trooper informed Hall that he was going to search his truck, and, during the course of that search, the trooper recovered a large white plastic bag, containing an off-white crystal substance, which was later identified as methamphetamine. Additionally, the trooper discovered a pill bottle, containing a small amount of marijuana.

Thereafter, the State charged Hall, via indictment, with one count of trafficking in methamphetamine and one count of possession of less than an ounce of marijuana. A few weeks after the indictment, Hall filed a motion to suppress the drugs seized from his pickup truck, arguing that the search and subsequent seizure was the result of an unlawfully prolonged traffic stop. The State filed a response, and several months later, the trial court conducted a hearing on the motion, during which the parties presented the evidence discussed above. In addition, the State played a video

7

of the trooper's traffic stop of Hall, which had been recorded by the dash-cam in the trooper's patrol vehicle. At the conclusion of the hearing, the trial court took the matter under advisement. Nonetheless, it ultimately denied Hall's motion.

Hall waived his right to a jury trial, and the case then proceeded to a bench trial, during which the State presented the evidence noted *supra*, as well as additional evidence from a Georgia Bureau of Investigation forensic chemist, who confirmed that the off-white crystal substance found inside the large white plastic bag seized from Hall's truck was methamphetamine. Following the trial's conclusion, the trial court found Hall guilty on the charge of trafficking in methamphetamine.[7] Thereafter, Hall obtained new counsel and filed a motion for new trial, arguing, *inter alia*, that his trial counsel rendered ineffective assistance by failing to renew his objection to the unlawfully seized evidence when it was admitted during his bench trial. The State filed a response, and, ultimately, the trial court denied Hall's motion. This appeal follows.

1. Hall contends that the trial court erred in denying his motion to suppress the evidence seized as a result of the traffic stop and subsequent search of his vehicle,

---

[7] The State agreed to the entry of *nolle prosequi* order as to the charge of possession of less than one ounce of marijuana.

arguing that the state trooper unlawfully prolonged the stop to allow for the arrival of the K-9 officer and his dog. We disagree.

Hall concedes that the initial traffic stop of his vehicle was lawful based on his failure to signal and crossing over the white line.[8] Indeed, when an officer observes a traffic offense, the resulting traffic stop does not violate the Fourth Amendment of the United States Constitution "even if the officer has ulterior motives in initiating the stop, and even if a reasonable officer would not have made the stop under the same circumstances."[9] But as the Supreme Court of the United States has explained,

> a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if

---

[8] *See Whren v. United States*, 517 U.S. 806, 810 (II) (116 SCt 1769, 135 LE2d 89) (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." (citation omitted)); *accord Maxwell v. State*, 249 Ga. App. 747, 748 (549 SE2d 534) (2001).

[9] *Hammont v. State*, 309 Ga. App. 395, 397 (710 SE2d 598) (2011) (punctuation omitted); *see Partlow v. State*, 346 Ga. App. 473, 478-79 (2) (816 SE2d 474) (2018) ("When an officer sees a traffic offense occur, a resulting traffic stop does not violate the Fourth Amendment even if the officer has ulterior motives in initiating the stop").

9

it is prolonged beyond the time reasonably required to complete that mission.[10]

Consequently, the tolerable duration of police inquiries in the traffic-stop context is "determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns."[11] Furthermore, after the tasks related to the investigation of the traffic violation and processing of the citation have been accomplished, an officer "cannot continue to detain an individual without reasonable articulable suspicion."[12] And importantly, "reasonable articulable suspicion" requires a "particularized and objective basis for suspecting that a citizen is involved in criminal activity."[13]

---

[10] *Illinois v. Caballes*, 543 U. S. 405, 407 (125 SCt 834, 160 LE2d 842) (2005) (citation omitted); *accord Allen*, 298 Ga. at 4 (2) (a); *Flores v. State*, 347 Ga. App. 174, 177 (2) (818 SE2d 90) (2018).

[11] *Rodriguez v. United States*, ___ U.S. ___ (135 SCt 1609, 1614, 191 LE2d 492) (2015) (citation omitted); *accord Allen*, 298 Ga. at 4-5 (2) (a); *Flores*, 347 Ga. App. at 177 (2); *Reyes v. State*, 334 Ga. App. 552, 555 (2) (780 SE2d 674) (2015).

[12] *Sherod v. State*, 334 Ga. App. 314, 321 (1) (779 SE2d 94) (2015) (punctuation omitted); *accord Faulkner v. State*, 256 Ga. App. 129, 130 (567 SE2d 754) (2002).

[13] *Sherod*, 334 Ga. App. at 321 (1) (punctuation omitted); *accord State v. Whitt*, 277 Ga. App. 49, 50 (625 SE2d 418) (2005); *Padron v. State*, 254 Ga. App. 265, 268 (1) (562 SE2d 244) (2002).

Here, the trooper had reasonable, articulable suspicion that Hall was involved in criminal activity—even independent of the observed traffic offenses—upon initiating the traffic stop. This is because reasonable, articulable suspicion "need not be based on an arresting officer's knowledge alone, but may exist based on the 'collective knowledge' of the police when there is reliable communication between an officer supplying the information and an officer acting on that information."[14] And here, when the trooper stopped Hall's vehicle, the HIDTA agent identified himself to the trooper, pointed out Hall's vehicle in the restaurant drive-thru, and informed the trooper that he suspected Hall had only minutes earlier engaged in an illegal drug transaction. Thus, this "collective knowledge" provided the trooper with reasonable,

---

[14] *Edmond v. State*, 297 Ga. App. 238, 239 (676 SE2d 877) (2009) (punctuation omitted); *see Blanks v. State*, 334 Ga. App. 626, 629 (1) (a) (778 SE2d 261) (2015) (noting that "[p]robable cause and articulable suspicion may rest upon the collective knowledge of the police when there is some degree of communication between them, rather than solely on the information possessed by the officer who actually makes the arrest" (punctuation omitted)); *Camp v. State*, 259 Ga. App. 228, 229 (1) (576 SE2d 610) (2003) ("Reasonable suspicion need not be based on an arresting officer's knowledge alone, but may exist based on the 'collective knowledge' of the police when there is reliable communication between an officer supplying the information and an officer acting on that information."); *see also Burgeson v. State*, 267 Ga. 102, 105 (475 SE2d 580) (1996) (noting that probable cause "can rest upon the collective knowledge of the police when there is some degree of communication between them, instead of the knowledge of the arresting officer alone.").

articulable suspicion,[15] which, in turn, justified prolonging the traffic stop until the arrival of the K-9 officer and his dog.[16]

Moreover, before the trooper completed the tasks related to the investigation of Hall's traffic violations—specifically, determining if Hall had insurance—he

---

[15] *See State v. Preston*, 348 Ga. App. 662, 665 (824 SE2d 582) (2019) (holding that the collective knowledge of the police gave rise to a reasonable, articulable suspicion the defendant was involved in selling drugs, given that an officer trained to recognize hand-to-hand transactions observed defendant engage in likely hand-to-hand transactions, and the officer communicated this information to the officer who actually stopped the defendant); *Blanks*, 334 Ga. App. at 629 (1) (a) (holding that collective knowledge in the form of information from an anonymous 911 caller and dispatcher, which was relayed to officer, provided that officer with reasonable articulable suspicion justifying the traffic stop); *Edmond*, 297 Ga. App. at 239-40 (holding that briefing attended by officer in which he was told to be on the look out for a specific vehicle that was connected with previous criminal activity, provided that officer with reasonable, articulable suspicion justifying his traffic stop upon later seeing that vehicle).

[16] *See Sherod*, 334 Ga. App. at 321-23 (1) (holding that investigating officer had reasonable, articulable suspicion of illegal activity to justify further detention of driver of tractor-trailer to conduct drug-dog sniff given driver's suspicious behavior, co-driver's criminal drug history, and inconsistency in driver's log-books); *Valentine v. State*, 323 Ga. App. 761, 766 (2) (748 SE2d 122) (2013) (holding that officer who performed traffic stop of defendant's tractor-trailer had reasonable, articulable suspicion of other illegal activity sufficient to justify prolonging the stop given defendant's inconsistent statements and non-compliant log-book); *Rocha v. State*, 317 Ga. App. 863, 867 (1) (733 SE2d 38) (2012) (holding inconsistencies in statements of defendant, who drove bus, and his co-driver regarding city in which they allegedly had most recently stopped and whether they recently dropped off any hurricane evacuees, as well as inconsistencies in their driver's log books, provided deputy with reasonable, articulable suspicion to prolong his detention of the defendant).

12

smelled an odor of marijuana emanating from Hall's pickup truck. Consequently, in addition to the knowledge obtained from his discussion with the HIDTA agent, the trooper had further reasonable articulable suspicion that Hall was engaged in illegal activity, which also justified prolonging the duration of the stop.[17] And, of course, once the K-9 officer's drug dog alerted, the trooper had *probable cause* to search Hall's truck.[18] Accordingly, the trial court did not err in denying Hall's motion to suppress the evidence seized from his truck.

2. Hall also maintains the trial court erred in denying his claim that defense counsel rendered ineffective assistance by failing to renew his objection to the unlawfully seized evidence when it was admitted at his trial. Again, we disagree.

---

[17] *See Rogers v. State*, 323 Ga. App. 647, 651 (747 SE2d 213) (2013) (holding that the fact the officer smelled marijuana emanating from defendant's vehicle provided reasonable, articulable suspicion justifying prolonging the duration of the traffic stop); *Warren v. State*, 314 Ga. App. 477, 482-83 (3) (724 SE2d 404) (2012) (same).

[18] *See Cromartie v. State*, 348 Ga. App. 563, 569 (824 SE2d 32) (2019) ("The drug dog's indication of the presence of drugs gave the officers probable cause to search the car"); *Jackson v. State*, 314 Ga. App. 272, 279 (2) (a) (724 SE2d 9) (2012) (noting that alert by drug dog provides officers with probable cause to search defendant's vehicle); *St. Fleur v. State*, 296 Ga. App. 849, 853 (2) (676 SE2d 243) (2009) (same); *see also Rodriguez*, 135 SCt at 1614-15 (holding that conducting an open-air dog sniff around a vehicle during a traffic stop does not itself violate the Fourth Amendment); *Allen*, 298 Ga. at 4 (same).

In order to evaluate Hall's claims of ineffective assistance of counsel, we apply the two-pronged test established in *Strickland v. Washington*,[19] which requires Hall to show that his trial counsel's performance was "deficient and that the deficient performance so prejudiced him that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different."[20] In addition, there is a strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct, and a criminal defendant must overcome this presumption.[21] In fact, the reasonableness of counsel's conduct is "examined from counsel's perspective at the time of trial and under the particular circumstances of the case[.]"[22] Importantly, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were "so patently unreasonable that no

---

[19] 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

[20] *Chapman v. State*, 273 Ga. 348, 349-50 (2) (541 SE2d 634) (2001); *see Strickland*, 466 U.S. at 687 (III); *Ashmid v. State*, 316 Ga. App. 550, 556 (3) (730 SE2d 37) (2012).

[21] *Chapman*, 273 Ga. at 350 (2); *see Cammer v. Walker*, 290 Ga. 251, 255 (1) (719 SE2d 437) (2011) ("A claim of ineffective assistance of counsel is judged by whether counsel rendered reasonably effective assistance, not by a standard of errorless counsel or by hindsight." (punctuation omitted)).

[22] *Lockhart v. State*, 298 Ga. 384, 385 (2) (782 SE2d 245) (2016).

14

competent attorney would have followed such a course."[23] And unless clearly erroneous, we will uphold a trial court's factual determinations "with respect to claims of ineffective assistance of counsel; however, a trial court's legal conclusions in this regard are reviewed *de novo*."[24] Bearing this well-established framework in mind, we will now consider Hall's specific claim of ineffective assistance of counsel.

During Hall's bench trial, a GBI forensic chemist testified she tested the substance found inside the white plastic bag seized from Hall's truck and concluded that it was methamphetamine. The State then sought to admit this bag of methamphetamine into evidence, and Hall's trial counsel stated that he had no objection. Hall now argues his counsel rendered ineffective assistance by failing to renew the objection that he asserted in his unsuccessful motion to suppress. But setting aside the fact that on several occasions during the trial, the State's prosecutor objected to what he characterized as Hall's trial counsel's attempt to "re-litigate" the motion to suppress, as discussed in Division 1, *supra*, the traffic stop and subsequent search of Hall's truck was not unlawful. Thus, any further objection would have been

---

[23] *Id.*

[24] *Sowell v. State*, 327 Ga. App. 532, 539 (4) (759 SE2d 602) (2014); *accord Duncan v. State*, 346 Ga. App. 777, 783 (2) (815 SE2d 294) (2018); *Howard v. State*, 340 Ga. App. 133, 139 (3) (796 SE2d 757) (2017).

futile, and "[f]ailure to pursue a futile motion does not constitute ineffective assistance."[25] Accordingly, Hall's contention that his trial counsel rendered ineffective assistance lacks merit.

For all these reasons, the trial court's judgment is affirmed.

*Judgment affirmed. Gobeil and Hodges, JJ., concur.*

---

[25] *Dixon v. State*, 273 Ga. App. 740, 745 (6) (615 SE2d 838) (2005) (punctuation omitted).